Morris APRIL et al.,

v.

NATIONAL CRANBERRY ASSOCIATION et al.

Civ. A. No. 56-567-A.

United States District Court
D. Massachusetts.

Nov. 20, 1958.

Hale & Dorr, James D. St. Clair, Boston, Mass., Blank, Rudenko, Klaus & Rome, Philadelphia, Pa., for plaintiffs.

Ropes, Gray, Best, Coolidge & Rugg, John R. Quarles, Esq., Boston, Mass., Simpson, Thacher & Bartlett, New York City, for National Cranberry & Glover.

Clark & Iseminger, Fletcher Clark, Jr., Middleborough, Mass., Donovan, Leisure, Newton & Irvine, New York City, for A. D. Makepeace Co. & Maurice C. Makepeace.

Withington, Cross, Park & McCann, Claude B. Cross, Philip M. Cronin, Boston, Mass., for United Cape Cod Cranberry Ass'n & Marcus Urann.

ALDRICH, District Judge.

This is a treble-damage action under section 4 of the Clayton Act, 15 U.S.C.A. § 15, against a so-called Capper-Volstead agricultural cooperative, two of its corporate members, and a number of their officers. The defendants are charged with violations of sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2. They move for summary judgment. The ground of their motion, as summarized orally by counsel, is that they are "wholly immune from suit where there is no allegation of conspiracy with outsiders." Cf. United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181.

Defendants base their claim of immunity on the Capper-Volstead Act, 7 U.S.C.A. § 291 et seq. Section 1 of that act provides in part as follows:

"Persons engaged in the production of agricultural products * * may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes * * *." 1

1. The Capper-Volstead Act, although enacted as a separate statute, was intended to clarify and extend to profit-making cooperatives with capital stock, such as the principal defendant, the exemption contained in section 6 of the Clayton Act, 15 U.S.C.A. § 17, which reads in part as follows:

They rely upon a recent decision by Judge Holtzoff, in which it was said that "an agricultural cooperative is entirely exempt from the provisions of the antitrust laws * * * as to all of its activities * * *" United States v. Maryland & Virginia Milk Producers Association, Inc., D.C.D.C., 167 F.Supp. 45, 52.[2] With all respect, I believe the learned judge reached this conclusion far too readily. It followed, apparently, from his statement, in response to the argument made to him that Capper-Volstead permitted only reasonable restraints, that "no legislation was necessary to permit reasonable restraints of trade." That statement, or the implications attached to it, overlooks something of importance.

▆▆▆ The Sherman Act has two aspects. As summarized in the Report of the Attorney General's National Committee to Study the Antitrust Laws (1955), at p. 30,

> "Section 1 of the Sherman Act, unlike Section 2, requires a plurality of actors for its violation. It does not proscribe restraints of trade, as such, but only 'every contract, combination in the form of trust or otherwise, and conspiracy in restraint of trade.' In marked contrast Section 2 may be violated by a single person who 'monopolizes' trade. In addition, however,

Section 2 makes it a separate violation to 'combine or conspire with any other person or persons, to monopolize' trade."

Thus, a single business enterprise may set for itself wholly unreasonable prices without violating section 1. However, any fixing of prices by the agreement of two or more persons violates this section even though the prices fixed are entirely reasonable. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700. It is clear that if individual agriculturalists, through the medium of a cooperative, jointly fixed prices, reasonably or otherwise, without statutory authorization, they would be subject to prosecution. The Capper-Volstead Act was passed to permit such joint action in order to remedy the economic weaknesses of "independent" farmers as compared with business and industry. In the House report on the bill, it was said, in part,

> "While this bill confers on farmers certain privileges, it can not properly be said to be class legislation. Business corporations have under existing law all the powers and privileges sought to be conferred on farm organizations by this bill. Instead of granting a class privilege, it aims to equalize existing privileges by changing the law applicable to the ordinary business corporations so the farmers

---

"Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of * * * agricultural * * * organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

2. This case was a civil action in which the government charged monopolization and attempted monopolization under section 2 of the Sherman Act. In dismissing this count the court went on to say, "Moreover, an agricultural cooperative

is apparently not subject to suit by a private person * * *." Id., 167 F. Supp. at page 52. To what the word "apparently" referred was not disclosed.

It may be noted that the court did recognize as "exceptions" a situation where the cooperative stepped outside its field and dealt in other products; and also where it conspired with outsiders, United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181. Strictly, if it is important, I would regard these situations as matters not included, as distinguished from exceptions. This is obvious as to the first. It seems equally clear that a person given a special exemption cannot conspire to give it to others. Concededly the language of the Borden opinion went further than this, but it is not clear how much further.

can take advantage of it." H.Rep. No. 24, 67th Cong., 1st Sess. 2 (1921).

Consequently, I think it insufficient to say that no legislation was needed to permit reasonable restraint of trade by a cooperative, and to draw unlimited conclusions therefrom. The inquiry must go deeper. On the other hand, it is hardly adequate simply to say, as plaintiffs do here, that Judge Holtzoff's decision was wrong.

 The minimum effect of the act was to equate an agricultural cooperative and its members with an individual business entity, as a lawful unit. The members could not be held for unlawful "combination" or "conspiracy," any more than could the officers of a single corporation, at least where the combination is an element of the substantive offense. Nelson Radio & Supply Co. v. Motorola, Inc., 5 Cir., 200 F.2d 911, 914, certiorari denied 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356; Marion County Co-op. Ass'n v. Carnation Co., D.C.W.D. Ark., 114 F.Supp. 58, 61–62, affirmed 8 Cir., 214 F.2d 557. This conclusion in substance disposes of section 1 of the Sherman Act.[3]

 Did Capper-Volstead go further, and provide that cooperatives and their members would not be liable for conduct forbidden to even an ordinary business entity? There is nothing in section 1 of Capper-Volstead referring to monopolization, or attempts thereat. The subject was frequently discussed, however, particularly during the debate in the Senate, where an amendment dealing with this question was reported out by the Committee on the Judiciary, S.Rep. No. 236, 67th Cong., 1st Sess. (1921) (set out at 62 Cong.Rec. 2120–21

(1922)). This amendment would have substituted for the present section 2, 7 U.S.C.A. § 292, a provision explicitly making applicable to the cooperatives all laws prohibiting monopolization. It was rejected by the Senate, 62 Cong.Rec. 2281 (1922), but I do not draw from this the conclusion that all acts of monopoly were automatically approved. Some light is cast by the debate subsequent to the filing of this amendment, in which a number of points were made: 1. That farmers would usually be prevented by the workings of economic laws from achieving a monopoly.[4] 2. That the possibility of a monopoly in a few specialized instances should not be permitted to outweigh the general benefits of the act.[5] 3. That if agriculturalists could be prosecuted for monopolizing, every local United States Attorney would be on their trail.[6] 4. That the harm resulting from a monopoly would be to the public, through enhancement of prices.[7] No mention is to be found of injury which would result to competitors of a cooperative if it engaged in predatory practices against them for the purpose of achieving a monopoly. With these announced considerations in mind, Congress passed section 2 of the act, 7 U.S.C.A. § 292, which commences:

"If the Secretary of Agriculture shall have reason to believe that any such association monopolizes or restrains trade in interstate or foreign commerce to such an extent that the price of any agricultural product is unduly enhanced by reason thereof, he shall serve upon such association a complaint * * *."

This section goes on to provide that the Secretary, after hearing, may issue a

---

3. I might not be so comprehensive in this ruling, were it not for the fact that there will be picked up by section 2 of the Sherman Act, discussed infra, any unlawful conduct which it might be felt Congress did not wish Capper-Volstead to immunize. Cf. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 60–61, 31 S.Ct. 502, 55 L.Ed. 619. It seems simpler to proceed under section

2 than to delineate some theory whereby the members of a cooperative become an "unlawful" combination at the moment they overstep permissible bounds.

4. E. g., 62 Cong.Rec. 2059 (1922).

5. E. g., id. at 2053.

6. Id. at 2050.

7. E. g., id. at 2049.

cease and desist order, and that if that is disregarded proceedings shall be had in the district court, which may issue an injunction, and enter such decree as it deems "equitable."

It is thus clear that the statement in the Maryland and Virginia Milk case that "an agricultural cooperative is entirely exempt from the provisions of the antitrust laws * * * as to all of its activities * * *." [8] must mean less than it says. I believe considerably less. In addition to the portion previously quoted, the House report continued:

> "In the event that associations authorized by this bill shall do anything forbidden by the Sherman Antitrust Act, they will be subject to the penalties imposed by that law. It is not sought to place these associations above the law, but to grant them the same immunity from prosecution that corporations now enjoy so that they may be able to do business successfully in competition with them." H.Rep. No. 24, 67th Cong., 1st Sess. 3 (1921).

This concept was emphasized throughout the debate.[9] There was, of course, the difference that government proceedings could be initiated by the Secretary of Agriculture pursuant to section 2. It is also possible to infer that such proceedings were intended to be the exclusive governmental remedy, within

limits which need not be here determined. See United States v. Borden Co., supra, 308 U.S. at pages 205–208, 60 S.Ct. at pages 191–192. But even if the government were so limited it would be another thing to infer that private suits could not be brought at all. Particularly I can think of no purpose to be served by permitting cooperatives to use unfair methods to put competitors out of business. To permit this would award agricultural cooperatives a very substantial "privilege or special favor," contrary to the bill's announced purpose and the disclaimers of its sponsors. In the absence of specific language in the act to the contrary, I hold that when Capper-Volstead provided that a cooperative and its members were not to be prohibited from "lawfully carrying out the legitimate objects thereof * * *" (to use the language of section 6 of the Clayton Act), at least it did not make lawful purely predatory practices seeking to monopolize, forbidden to an individual corporation, nor did it deprive the victims of such practices effected with monopolizing intent of their private right of action under section 4 of the Clayton Act.[10]

The defendants, alternatively, move for partial summary judgment with respect to the statute of limitations, on the ground that plaintiffs are barred for all periods prior to April 8, 1953, two years before the date the statute

---

8. Cf. the second paragraph of note 2, supra.

9. Thus Representative Volstead said, "The objection made to these organizations at present is that they violate the Sherman Antitrust Act, and that is upon the theory that each farmer is a separate business entity. When he combines with his neighbor for the purpose of securing better treatment in the disposal of his crops, he is charged with a conspiracy or combination contrary to the Sherman Antitrust Act. Business men can combine by putting their money into corporations, but it is impractical for farmers to combine their farms into similar corporate form. The object of this bill is to modify the laws under which business organizations are now formed, so

that farmers may take advantage of the form of organization that is used by business concerns * * *" 61 Cong. Rec. 1033 (1921); see also 62 Cong. Rec. 2453 (1922). Senator Capper said, "Mr. President, the farmers do not ask any privilege or special favor. They simply request an opportunity to adopt the system of group marketing which the law has made inevitable with ordinary industries for many decades." Id. at 2059.

10. Whether the action should go to trial on the present complaint I will not finally dispose of on this motion, in view of the scope of the defendants' contentions as to immunity, and the possibility of amendment. I will not, however, allow an amendment as to Eatmore.

was tolled by government action brought against some of the defendants. Plaintiffs allege illegal activities commencing in 1945 or 1947. The following dates are of importance. January 1, 1950: State statute of limitations, Mass. G.L. (Ter.Ed.) c. 260, § 2A, added, reducing the applicable period from six years to two years, prospectively only. Mass. Acts 1948, c. 274, § 3. April 8, 1955: Government action instituted. July 7, 1955: Four-year federal statute of limitations enacted to take effect January 7, 1956, superseding, retrospectively, all state statutes, but not reviving actions already barred by shorter state statutes. 15 U.S.C.A. § 15b. Section 5 of the Clayton Act, 15 U.S.C.A. § 16, also amended, effective January 7, 1956. July 11, 1956: Present action instituted. October 23, 1957: Government action terminated.

So far as the Massachusetts statutes were concerned, activities by the defendants occurring prior to January 1, 1950, were subject to a six-year period, while those occurring thereafter endured only two years. On April 8, 1955, the date the government action was instituted, rights commencing in the period January 1, 1950 to April 8, 1953, had become barred, but the interval April 8, 1949 through December 31, 1949 had not.[11] The question is, did section 15b, the federal four-year statute cut these off? Manifestly it did, absent section 5(b) of the Clayton Act, as amended in 1955, 15 U.S.C.A. § 16(b). That section continued (and enlarged) a former provision suspending statutes of limitation as to private actions during the pendency of related government proceedings, and tied in that provision with the new federal limitation period. Defendants' contention is that, construing these two sections together, section 16(b) saves only rights which had accrued within four years of the time when suspension commenced. Section 15b and the amendments to section 16 were enacted so as not to take effect for six months, in order to allow persons having rights more than four years old at the date of passage, but still not barred under their local statute, a period of grace in which to commence suit. On the other hand, the purpose of section 16, before and after amendment, was to relieve private parties of the necessity of bringing suit during the pendency of government action. The statute does not specifically provide for the situation in which the state limitation period is longer than the federal, and government proceedings were pending throughout the six months' grace period. Defendants' position would in effect make an exception to the policy of section 16(b) by still requiring suit to be brought during the grace period if plaintiff wished to save causes of action which were more than four years old. In the absence of clear statutory language I will not so hold. Cf. Goodfriend v. Kansas City Star Co., D.C.W.D.Mo., 158 F.Supp. 531.

Finally, defendants contend that this being a single action against them jointly, without right of contribution, and one of their number admittedly being subject to a limitation period commencing only in 1954, the plaintiffs must either dismiss against him, or limit their recovery against all defendants to 1954. Essaness Theatres Corp. v. Balaban & Katz Corp., D.C.N.D.Ill., 1955 Trade Cases, ¶ 68,152. Plaintiffs reply that even if this be so, they should not be required to elect at this stage of the proceedings. I will postpone this question, at least to pretrial.

Motion for summary judgment denied.

---

11. I am not presently passing on the question of whether it is the occurrence of overt acts, or of damages, which causes the action to accrue. Cf. Delta Theaters, Inc., v. Paramount Pictures, Inc., D.C.E.D.La., 158 F.Supp. 644, 647–649.