NORTHERN CALIFORNIA SUPER-
MARKETS, INC., Plaintiff,

v.

CENTRAL CALIFORNIA LETTUCE
PRODUCERS COOPERATIVE et
al., Defendants.

No. C–74–2002 WHO.

United States District Court,
N. D. California.

Jan. 30, 1976.

Ronald J. Lovitt, Lovitt & Hannan, Inc., San Francisco, Cal., William J. Maledon, Phoenix, Ariz., J. Michael Hennigan, San Francisco, Cal., Martori, Meyer, Hendricks & Victor, Phoenix, Ariz., for plaintiff.

George E. McInnis, Arnold B. Myers, Abramson, Church & Stave, Salinas, Cal., Max Thelen, Jr., Robert B. Pringle, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for defendants other than The Garin Co.

Fredrik S. Waiss, O'Donnell, Waiss, Wall & Meschke, San Francisco, Cal., for defendant The Garin Co.

## OPINION

ORRICK, District Judge.

In this antitrust action, plaintiff, Northern California Supermarkets, Inc. (Northern), charges that defendants, Central California Lettuce Producers Cooperative (Central) and nine of its members, have combined and conspired to fix the price of lettuce shipped in interstate commerce from the Salinas-Watsonville-King City area of the Salinas Valley in California in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) (Section 1). The Court must determine if the activities of defendants, alleged to be in violation of Section 1, are shielded from antitrust attack by Section 6 of the Clayton Act (15 U.S.C. § 17) (Section 6), the Capper-Volstead Act (7 U.S.C. §§ 291–292) (Capper-Volstead), and/or Section 5 of the Cooperative Marketing Act of 1926 (7 U.S.C. § 455) (Section 5). For the reasons hereinafter stated, I hold that Section 6 and Capper-Volstead, and each of them, exempt the activities of defendants challenged in this complaint from the application of Section 1.[1]

### I.

The question at issue is before the Court on cross-motions for summary judgment supported by statements of facts, voluminous briefs, affidavits, one deposition, answers to interrogatories, and requests for admission.[2] The facts hereinafter summarized are essentially undisputed.

Plaintiff, Northern, is a California corporation engaged in the retail sale of groceries, including produce, through twenty supermarkets (Purity and Friendly Supermarkets) scattered throughout Northern California.

Defendant Central is a nonprofit cooperative association, without capital stock, incorporated under the provisions of Chapter 1, Division 20, of the Agricultural Code of the State of California, for the purpose of providing mutual help in connection with producing and marketing, including selling, of any farm product of its members. Central's purpose, among other things, is to improve conditions in the produce industry for the mutual benefit of its members as producers by promoting, fostering, and encouraging the intelligent and orderly marketing of agricultural products through cooperation; eliminating speculation and waste; making the distribution of agricultural products between producers and consumers as direct as can be officially done; stabilizing the marketing of agricultural products; encouraging efficiency and economy in marketing; preventing the demoral-

---

1. Accordingly, I do not reach the question of the effect, if any, of Section 5 on Central's activities.

2. Counsel for all parties agreed in open Court that there are no genuine issues of the material facts. The Court is, of course, aware of the *caveat* expressed time after time by the Supreme Court against the use of summary judgments in complex antitrust cases. *Poller v. Columbia Broadcasting Systems, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969). But, this case is one in which the Court agrees there are no undisputed facts and that the case is ripe for disposition by summary judgment. See, *Hycon Manufacturing Co. v. H. Koch & Sons*, 219 F.2d 353 (9th Cir. 1955), *cert. denied*, 349 U.S. 953, 75 S.Ct. 881, 99 L.Ed. 1278 (1955).

izing of markets resulting from dumping and predatory practices; mitigating the recognized evils of a marketing system under which prices are set for the entire industry by the weakest producers; and fostering the ability of the members of the cooperative to obtain prices for their products in competitive markets which are fair prices but not prices inflated beyond the reasonable value of such products by reason of artificially-created scarcity of such products or other predatory practices which would injure the public interest.

Each of the other nine defendant corporations [3] (member-defendants) is a grower-shipper of fresh produce, including lettuce, in the growing areas of California and Arizona and is a member of Central. Each member-defendant grows lettuce in the Salinas-Watsonville-King City area, the agricultural production area of concern in this case.

The member-defendants formed Central in 1972 for the purpose of ameliorating conditions of price uncertainty, demand inelasticity, and distress selling which historically characterized lettuce production. Lettuce is a perishable food, which means that once it ripens it must be harvested and shipped within four or five days. Harvesting decisions are made on a day-to-day basis and depend on such factors as volume shipped, the prices received on the preceding day, information concerning price in major terminal markets, local weather conditions, and the condition of the crop. Lettuce is cut, packed, and inspected in the field. It is normally packed twenty-four heads to a cardboard carton and then trucked to a cooling station. Buyers may inspect the lettuce in the field or at the cooling place, and may there compare quality as between different grower-shippers or between the lettuce produced in different fields but handled by the same grower. While lettuce is not advertised to consumers on a brand basis, individual label names are used by growers, and certain labels have achieved some measure of trade recognition for quality. The cartons of lettuce are shipped from the cooling places by rail or truck to destinations throughout the United States. Most lettuce is sold f.o.b. at the shipping point.

Common marketing practices included distress consignments, "no-bills" and "rollers". Distress consignments occurred when shipments of lettuce could not be sold at the shipping points and were, therefore, consigned to a wholesaler who would undertake to sell the shipment at the terminal market. In the absence of a sale or consignment, a grower-shipper sometimes "rolled" a shipment of lettuce toward Eastern markets and endeavored to sell it while the shipment was enroute. Otherwise, he might "no-bill" the shipment, that is, provide no bill of lading for that day, but hold the shipment for another day for possible sale or consignment.

In May, 1973, Central entered into an identical "Cooperative Marketing Agreement" with each of its twenty-two members, including the nine member-defendants. Under the terms of the Agreement, the members exchange information regarding the actual and expected status of all crops and agree (a) to inspection of the condition, quality, and quantity of their crops, (b) to make no discounts or concessions in lieu of brokerage, (c) to sell lettuce within the limits of ceiling prices and floor prices established by Central and not to ship lettuce which has not been sold or consigned, and (d) to report delinquent accounts and chronic complainers to Central. Members have also agreed that lettuce sold by the members shall be in master containers which identify the lettuce as being sold by a member of Central. During 1973-1974, the years which are concerned in this action, each member-defendant had a seat on the Board of Directors, as well as on the Executive Committee, of Central. The Executive Committee met at least weekly and determined the pricing policy to which

3. Admiral Packing Company, Green Valley Produce Co-op, Growers Exchange, Inc., Let-Us-Pak, Pacific Lettuce, Royal Packing Company, Salinas Marketing Cooperative, The Garin Company, and United Brands Company.

each member would adhere in the sale of lettuce for a specified period. The Committee usually determined a ceiling price and, in at least one case, a minimum and a maximum price to be charged by its members. The Committee members exchanged market information in the process of determining pricing policies.

Central itself has never shipped, handled, harvested, or grown any lettuce. Central does not negotiate directly with buyers of lettuce, and during the 1973-1974 season, no lettuce was sold by Central acting in its own name or through agents employed by Central to act in its own name. Central has never employed any sales personnel and, during the 1973 season, it had no payroll whatsoever. Central's income comes from membership fees and assessments.

Each member of Central conducts its own individual sales program and each member has retained the trademark under which it did business prior to the formation of Central. Each member negotiates and sells to buyers of lettuce directly and payment for such lettuce is billed and collected for each member's individual account.

Defendants have publicized their organization and the terms of their collective bargaining agreement through a series of advertisements in *The Packer*, a trade newspaper. During periods of low price and large supply defendants, through Central, have sponsored special programs to increase the sale of lettuce.

During 1973, some 31,262,000 cartons of lettuce were shipped from the Salinas-Watsonville-King City growing area, of which shipments by the member-defendants totaled approximately 20,200,000. During 1973-1975, Northern purchased over 40,000 cartons of lettuce through the medium of a nonprofit purchasing cooperative, most of which was produced and marketed by the member-defendants.

Plaintiff and defendants agree that the primary activity of Central is to set prices or price ranges to which members are required to adhere in the sale of their lettuce. The record indicates that Central also engages in other activities related to the marketing of lettuce. For example, Central gathers and disseminates information concerning lettuce planting, harvesting, and shipment. Information is also exchanged by the members concerning delinquent accounts and "chronic customer complainers". In addition, Central coordinates policies with respect to marketing practices which proved harmful to lettuce growers and has undertaken promotional campaigns aimed at bolstering lettuce sales. However, Northern maintains that these other activities are separate and unrelated to the price-fixing function of the cooperative.

The gravamen of Northern's complaint against Central and the member-defendants is that their activities described above in the marketing and selling of lettuce constitute an unlawful combination and conspiracy to restrain trade and commerce in violation of Section 1 by eliminating competition in the sale and marketing of fresh lettuce and by raising, fixing, controlling, and establishing the prices and price ranges at which each member-defendant offers to sell, or sells, lettuce.[4] By way of affirmative defense, Central and its members assert that their activities are insulated from antitrust attack by Section 6, Section 1 of Capper-Volstead and Section 5. Northern responds that these statutes only permit

---

4. Northern further charges that this conspiracy has been carried out by Central and the member-defendants through meetings at which they have discussed or agreed upon the prices or price ranges at which each member-defendant would sell lettuce to its customers and by agreeing in writing to sell lettuce to all customers only at prices within the limits of the ceiling and floor prices established on a weekly or daily basis by Central. Northern claims that the effect of the alleged combination and conspiracy has been to fix and maintain prices for Salinas Valley lettuce at artificial and noncompetitive levels and to deny the purchasers of such lettuce the opportunity to purchase lettuce at competitively determined prices. Northern further charges that competition among the producers and marketers of Salinas Valley lettuce has been unlawfully and unreasonably restricted and that it and all other persons who purchased the Salinas Valley lettuce have been forced to pay unreasonably high prices for such lettuce.

price-fixing by an agricultural cooperative where the price-fixing is ancillary to and a necessary incident of an otherwise legitimate collective activity. Northern claims that since Central performs no collective function to which price-fixing can be said to be a reasonable and necessary incident, its price-fixing is not protected.

## II.

To determine whether the activities of Central and the member-defendants are shielded from antitrust attacks by Section 6 and Capper-Volstead, we turn to an analysis of the legislative history of the Acts and a review of the cases interpreting the Acts.

### A. *Section 6*

The last time antitrust was an issue in a presidential campaign was in 1912, and it was in response to President Wilson's promises that the Congress in 1914 passed the Clayton Act. But, the Congress, concerned about the minimal bargaining power of the individual farmer in the markets in which he buys and sells, and in order to encourage him to form agricultural organizations for mutual help, exempted such organizations from the application of the antitrust laws by enacting Section 6. The exemption provides that:

> "Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual mem-

bers of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." 15 U.S.C. § 17.[5]

Section 6 expressed the Congressional policy of treating farmers differently from industrialists and middlemen. Congress perceived farmers as being at the mercy of sharp dealers in the sale of their produce and, therefore, made it possible for them to form cooperatives to help themselves. See *Tigner v. Texas*, 310 U.S. 141, 145–146, 60 S.Ct. 879, 881, 84 L.Ed. 1124, 1127 (1940); *Frost v. Corporation Commission*, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483 (1928) (dissenting opinion, Holmes, J.).

The general effect of Section 6 was to assure that the existence of agricultural organizations *per se* would not be deemed to be an illegal conspiracy or restraint of trade, and that members of such organizations would not be judicially harassed under the antitrust laws for combining to carry out the legitimate objects of the organization. Hufstedler, *A Prediction: The Exemption Favoring Agricultural Cooperatives Will be Reaffirmed*, 22 Ad.L.Rev. 455, 458 (1969–1970).

The structural requirements for Section 6 exemptions are not stringent. An agricultural organization without capital stock, instituted for mutual self-help and not conducted for profit, qualifies for the exemption. That is precisely what Central is—an agricultural organization without capital

---

**5.** The inclusion of the agricultural exemption in Section 6 was prompted by the fact that agricultural cooperatives had been subjected to prosecutions in various state courts for monopolistic and conspiratorial activities. Comment, *Agricultural Cooperatives—The Clayton Act and the Capper-Volstead Act Immunize the Concerted Price Bargaining of Two Agricultural Cooperatives from Antitrust Liability*, 53 Tex.L.Rev. 840 (1975) (hereinafter cited as Comment, *Agricultural Cooperatives*); *Antitrust Exemptions—Agricultural Cooperatives*, 31 A.B.A. Antitrust L.J. (1967).

The House and Senate Committee Reports on Section 6 (H.R.Rep. No. 627, 63d Cong., 2d Sess. (1914); S.Rep. No. 698, 63d Cong., 2d

Sess. (1914)) manifested a Congressional desire to erase all doubt about the propriety of the existence of agricultural associations meeting the statutory requirements, and also to prevent a judicial construction of the antitrust laws which would require dissolution of such cooperatives or interfere with the carrying out of their legitimate and lawful objects. Comment, *Agricultural Cooperatives, supra*, at 841 n. 10.

Section 6 has thus been regarded as granting to farmers the right to organize in order to take collective action for their mutual benefit. Saunders, *The Status of Agricultural Cooperatives Under the Anti-trust Laws*, 20 Fed.B.J. 35 (1960).

stock formed for the purpose of mutual help. It is not conducted for profit.

### B. *Capper-Volstead*

In 1922, in order to extend the Section 6 immunization from antitrust attack to farmer organizations with capital stock, the Congress enacted the Capper-Volstead Act, Section 1 of which reads as follows:

"Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: *Provided, however*, That such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements:

First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or,

Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

And in any case to the following:

Third. That the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members." 7 U.S.C. § 291.

■ Capper-Volstead was enacted to clarify and extend the Section 6 exemption. *Case-Swayne Co. v. Sunkist Growers*, 389 U.S. 384, 391, 88 S.Ct. 528, 532, 19 L.Ed.2d 621, 626 (1967). The Act explicitly enumerated certain legitimate activities of qualifying cooperatives. One significant purpose of the statute was to make it clear that farmers could operate collectively for the purpose of marketing as well as preparing for market. 20 A.L.R.Fed. 924, 927 (1974). A principal objective was to allow farmers to take advantage of the corporate form of organization used by business concerns. 61 Cong.Rec. 1033 (remarks of Congressman Volstead). As expressed by its sponsors, the thrust of the bill was to give farmers a fair opportunity to meet business conditions of the times by forming into collective aggregates without fear of prosecution under the antitrust laws in order to equalize the situation between individual farmers and corporate middlemen. H.R.Rep. No. 24, 67th Cong., 1st Sess. (1921).

### C. *Scope of the Exemptions*

The best summary of the legislative history and the nature of the agricultural exemption under Section 6 and Capper-Volstead is contained in Justice Black's opinion in *Maryland and Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 465–466, 80 S.Ct. 847, 852, 4 L.Ed.2d 880, 887 (1960):

"The language [of Section 6] shows no more than a purpose to allow farmers to act together in cooperative associations without the associations as such being 'held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws,' as they otherwise might have been. This interpretation is supported by the House and Senate Committee Reports on the bill. Thus, the full effect of § 6 is that a group of farmers acting together as a single entity in an association cannot be restrained 'from lawfully carrying out *the legitimate objects* thereof' (emphasis supplied), but the section cannot support the contention that it gives such an entity full freedom to engage in predatory trade practices at will. [Citations omitted.]

The Capper-Volstead Act of 1922 extended § 6 of the Clayton Act exemption to capital stock agricultural cooperatives which had not previously been covered by that section. Section 1 of the Capper-

Volstead Act also provided that among 'the legitimate objects' of farmer organizations were 'collectively processing, preparing for market, handling, and marketing' products through common marketing agencies and the making of 'necessary contracts and agreements to effect such purposes.' We believe it is reasonably clear from the very language of the Capper-Volstead Act, as it was in § 6 of the Clayton Act, that the general philosophy of both was simply that individual farmers should be given, through agricultural cooperatives acting as entities, the same unified competitive advantage—and responsibility—available to businessmen acting through corporations as entities. As the House Report on the Capper-Volstead Act said:

> 'Instead of granting a class privilege, it aims to equalize existing privileges by changing the law applicable to the ordinary business corporations so the farmers can take advantage of it.'

This indicates a purpose to make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws."

■ Despite the preferred treatment given to agricultural producers, it is clear that neither Section 6 nor Capper-Volstead was intended to create an absolute shield from antitrust liability for agricultural cooperatives. Farmers and their organizations have been held to lose protection from antitrust attack when the cooperative or its members combine with nonproducer "outsiders" to unreasonably restrain trade. *United States v. Borden Co.*, 308 U.S. 188,

60 S.Ct. 182, 84 L.Ed. 181 (1939). Nor are farmers immune when the cooperative or its members engage in predatory, competitive-stifling practices directed at restraining trade or monopolizing the market by unlawful means. *Maryland and Virginia Milk Producers Ass'n v. United States, supra*; see generally, 20 A.L.R.Fed. 924 (1974) *et seq.*

Neither situation is here present. There is no allegation that Central or its members have combined or attempted to combine with nonproducers, nor is there any allegation that defendants have engaged in predatory practices or have attempted to monopolize, or monopolized, the market by unlawful means.[6]

### III.

The principal dispute between the parties here concerns the scope of the protection afforded by Capper-Volstead, and the effect of Capper-Volstead on the Section 6 exemption.

Northern contends that Section 6 and Capper-Volstead must be read together, and thus Central's claim to immunity must rise or fall on whether or not it is engaged in "collective marketing" within the meaning of Capper-Volstead.

Northern asserts that the antitrust exemption afforded by Section 6 and Capper-Volstead is limited in scope and should be construed narrowly. Accordingly to Northern, the purpose of the exemptions was to give farmers greater bargaining power by allowing them to form associations to perform specific functions, i.e., collective marketing, processing, and handling. The thrust of the exemption, therefore, was to put farmers on an equal basis with corpo-

---

**6.** It should be noted that the cases where courts have found predatory practices have involved serious coercive conduct aimed at bringing nonmember producers into the cooperative or achieving monopoly through threats, boycotts, and interference with others. See, e.g., *Maryland and Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960); *Bergjans Farm Dairy Co. v. Sanitary Milk Producers*, 241 F.Supp. 476 (E.D.Mo.1965), *aff'd*, 368 F.2d 679 (8th Cir. 1966); *Washington Crab Ass'n*, 66 F.T.C. 45 (1964); *North Texas Producers Ass'n v. Metzger Dairies, Inc.*, 348 F.2d 189 (5th Cir. 1965), *cert. denied*, 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966). See also *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 216–217 n. 11 (9th Cir. 1974), *cert. denied*, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974).

rate middlemen and buyers by allowing the farmers to do business in a corporate-type form. Thus, Northern concludes the purpose of the limited exemption for agricultural cooperatives is to permit farmers to associate for mutual benefit by acting collectively through the single medium of a cooperative. The statutory exemptions contemplate that a cooperative will represent its members and that *it will be the entity* through which the members act.

Northern then argues that Central does not engage in collective marketing within the meaning of Capper-Volstead, and thus the action of Central and its members constitutes illegal price-fixing, a *per se* violation of Section 1, because each member of Central acts independently for its own account in every material aspect except for the determination of the price range at which it sells. Since Central does not grow, harvest, ship, sell or negotiate for sale in its own name, Northern contends that it is not engaged in "collective marketing". Essentially, Northern argues that an agricultural cooperative must engage in bargaining, selling, processing or handling before it can also fix prices. Northern further claims that the price-fixing in this case is especially reprehensible because the growers are not small struggling farmers but "a group of big corporate businesses attempting to find shelter" from the antitrust laws.

Central, on the other hand, contends that Section 6 and Capper-Volstead, although overlapping, are separate and independent sources of protection for its activities.

■ I agree. I find that Central's activities, including price-fixing, fall within the scope of protection from the antitrust laws afforded by Section 6 and Capper-Volstead.

■ I am persuaded that since Justice Black, in *Maryland and Virginia Milk Producers Ass'n v. United States, supra,* stated that the activities enumerated in Section 1 of Capper-Volstead were "among 'the legitimate objects' of farmer organizations" this necessarily implies that (a) Section 6 and Capper-Volstead, although overlapping, are

not synonymous, and (b) it is not necessary for a farmer association to engage in all of the enumerated activities to qualify for the exemption.

I am further convinced that Central's activities are consistent with the purpose of the statutes "to make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce". *Maryland and Virginia Milk Producers Ass'n v. United States, supra,* 362 U.S. at 466, 80 S.Ct. at 853, 4 L.Ed.2d at 888.

The recent Ninth Circuit opinion in *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.,* 497 F.2d 203 (9th Cir. 1974), *cert. denied,* 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974), is controlling here. Treasure Valley was a cooperative of potato growers, the principal function of which was to bargain collectively for its members with respect to the price and terms of preseason potato contracts. The association did not process, prepare for market, handle, buy or sell any potatoes; all of the actual selling was done by the individual members. Another similar cooperative was also involved in the case, and the officers and members of the two cooperatives met and exchanged information regarding negotiations with buyers so that neither cooperative would undersell the other.

The two cooperatives had filed an antitrust action against the potato processors; the processors had counterclaimed against the associations, claiming that neither was exempt under Capper-Volstead because they engaged in none of the functions enumerated in the statute.

The Court stated:

"True, the associations did not collectively *process, prepare for market, handle* or actually sell potatoes. But Section 1 of the Capper-Volstead Act further authorizes 'Persons engaged in the production of agricultural products as farmers . . . [to] act together in associations . . . in collectively . . . *marketing* in interstate and foreign commerce, such products of persons so en-

gaged . . ..' (Emphasis added)" 497 F.2d at 215.

The Court then concluded:

"The activities of the two associations came within the word *marketing.*" Id.

.   .   .   .   .

and continued:

"We think the term *marketing* is far broader than the word *sell.* A common definition of 'marketing' is this: 'The aggregate of functions involved in transferring title and in moving goods from producer to consumer, including *among others* buying, selling, storing, transporting, standardizing, financing, risk bearing, and *supplying market information.*' Webster's New Collegiate Dictionary, 1953 Edition. [Emphasis added]. The associations here were engaged in bargaining for the sales to be made by their individual members. This necessarily requires supplying market information and performing other acts that are part of the aggregate of functions involved in the transferring of title to the potatoes. The associations were thus clearly performing 'marketing' functions within the plain meaning of the term. We see no reason to give that word a special meaning within the context of the Capper-Volstead Act." Id.

Central's activities fall within the term "marketing" as broadly construed in *Treasure Valley.* Section 6 authorizes members of farmers cooperatives to carry out the legitimate objects of the association. Capper-Volstead authorizes those objects to be obtained or furthered by members by making contracts or agreements. Central's members, in pursuit of the marketing objectives of the cooperative, were authorized to sell their lettuce within approved price ranges through contracts or agreements. The aggregate of activities of Central constitute "collective marketing" within the meaning of the phrase as defined in *Treasure Valley.* Here, as in *Treasure Valley,* Central was "supplying market information and performing other acts * * * involved in the transferring of title" of the produce. 497 F.2d at 215. But, even in *Treasure Valley,* the *principal* function of the cooperative was to set prices.[7]

Northern tries to distinguish *Treasure Valley,* saying that the cooperative there engaged in collective bargaining whereas Central only sets prices, but each member does his own bargaining. This is a distinction without a difference.

■ Moreover, I am of the opinion that even if Central engaged in no other collective marketing activities, mere price-fixing is clearly within the ambit of the statutory protection. It would be ironic and anomalous to expose producers, who meet in a cooperative to set prices, to antitrust liability, knowing full well that if the same producers engage in even more anticompetitive practices, such as collective marketing or bargaining, they would clearly be entitled to an exemption.

It is true that the sponsors of Capper-Volstead were laboring under the assumption that the cooperative or association would be the collective marketing agent for the farmers in most circumstances. However, there is nothing in the legislative history that suggests a Congressional intention to *force* farmers into a corporate form or that collective marketing with the cooperative as the exclusive agent was considered the *only* form under which farmers' groups could organize.[8]

---

**7.** In the course of the litigation in *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.,* 497 F.2d 203 (9th Cir. 1974), *cert. denied,* 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974), the court also recognized a distinction between Section 6 and Capper-Volstead. The district court had found that the Treasure Valley cooperative was protected by Section 6, but not by Capper-Volstead. Although the Ninth Circuit found that Capper-Volstead applied, it left untouched the district court's ruling as to the Section 6 exemption.

**8.** Congress was aware of the existence of farmers' associations similar to Central at the time Capper-Volstead was considered. Members of such associations met and agreed among themselves upon a price at which they individually should sell their products. This is clear from the testimony of G. Carroll Todd, former head of the Antitrust Division of the Department of

Indeed, Congressman Volstead stated:

"The aim has been to make the provisions of the bill sufficiently liberal so that all cooperative farm associations operated in good faith for the benefit of its members might avail themselves of the provisions of this bill." H.R.Rep. No. 24, 67th Cong., 1st Sess. (1921).

Furthermore, it appears that Congress intended to authorize price-fixing by an agricultural cooperative unless the organization engaged in predatory practices or monopolization.[9]

As Senator Reavis pointed out:

"This legislation is primarily inspired by the desire to put the farmer in a condition, through cooperation and organization, where in some measure he may overcome the difficulties that inhere in his business, that make cooperation and organization almost impossible, to relieve him in some measure from his natural handicaps and put him on an equal footing with all the other businessmen of America and *permit him in some measure to fix the price of the thing that he raises.*" 61 Cong.Rec. 1038 (1921) (Emphasis added).

Thus, in absence of predatory practices or a combination with outsiders, an alleged conspiracy or combination among an agricultural cooperative and its members in regard to pricing policies is immune from the proscriptions of Section 1. See *United Egg Producers v. Bauer International Corp.,* 312 F.Supp. 319 (S.D.N.Y.1970); *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc., supra,* 497 F.2d at 212–213.

Protection for price-fixing follows from the effect of Section 6 and Capper-Volstead in equating an agricultural cooperative and its members with an individual business entity since a single business enterprise may set for itself even wholly unreasonable prices without violating Section 1. *April v. National Cranberry Association,* 168 F.Supp. 919, 921–922 (D.Mass.1958).[10]

Thus, Capper-Volstead, like Section 6, shields Central's activities from the application of the antitrust laws. Central, as we have seen, is an association without capital stock formed by persons engaged in the production of agricultural products as farmers who are acting in Central "in collectively . . . marketing in interstate and foreign commerce, such products of persons so engaged . . . ".[11]

Justice, in hearing on the bill, as well as from statements of Dallas Berry of the Maryland and Virginia Milk Producers Association, Inc. at the same hearings. Hearings on S. 4344 before the Senate Committee on the Judiciary, 66th Cong., 2d Sess. (1920) at 37–43 or 63–64.

9. Protection against excessive prices or predatory practices was provided by Section 2 of Capper-Volstead, which authorizes the Secretary of Agriculture to issue a cease-and-desist order upon a finding that a cooperative has monopolized or restrained trade to such an extent that the price of an agricultural commodity has been "unduly enhanced". Section 2 further provides that such an order may be enforced by the Attorney General in appropriate proceedings in the district court if it is disregarded. 7 U.S.C. § 292.

The enactment of Section 2 reflected a congressional desire to limit the power of cooperatives to restrain trade or achieve monopoly by engaging in unfair methods of competition. *Maryland and Virginia Milk Producers Ass'n v. United States,* 362 U.S. 458, 466–467, 80 S.Ct. 847, 853, 4 L.Ed.2d 880, 887–888; *April v. National Cranberry Association,* 168 F.Supp. 919, 922–923 (D.Mass.1958). However, as noted,

there is no claim here that Central has engaged in any predatory practices.

10. Central also relies on the FTC case of *Washington Crab Assn.,* 66 F.T.C 45 (1964), where the Commission considered a challenge to the activities of a fishermen's cooperative. The FTC recognized that the members of the association had fixed prices. However, the FTC noted that this they were expressly permitted to do under Section 1 of the Fishermen's Collective Marketing Act (15 U.S.C. § 521) which the FTC considered as virtually identical to Section 1 of Capper-Volstead. It does for the fishermen precisely what Capper-Volstead does for the farmers. The FTC concluded that price fixing was an approved objective if not pursued by predatory techniques. 66 F.T.C. at 105–106.

11. Northern has submitted to the Court a copy of the initial decision rendered by an administrative law judge in a proceeding before the Federal Trade Commission, *Central California Lettuce Producers Cooperative,* No. 8970 (March 13, 1975). Faced with the same issues presented for consideration in this case, the administrative law judge decided that Central was *not* engaged in collective marketing as

994

Accordingly, I hold that Central's activities are protected from antitrust attack by both Capper-Volstead and Section 6, since it is doing no more than carrying out the legitimate objects of an agricultural organization.[12]

Defendants also claim protection under Section 5 of the Cooperative Marketing Act of 1926 (7 U.S.C. § 455)[13] which authorizes the exchange of information between persons engaged in collective marketing of agricultural products through an association. It is unnecessary to rule on this claim for exemption in light of the above holdings.

I grant Central's motion for summary judgment and deny Northern's motion for summary judgment. Central shall submit a form of judgment approved by Northern by February 16, 1976.

defined in Capper-Volstead and, therefore, was not exempt from the antitrust laws. He held the purpose of Capper-Volstead was to allow farmers to join together to bargain "as one", thus permitting a pooling of resources of small, disorganized growers into a single, democratically functioning corporate entity and that to be exempt, a cooperative must acquire and bargain to sell the entire production of its members, or at least bargain for the members in the open market. He also expressed the opinion that the statute was intended to protect small farmers, and it should not be allowed to shield the activities of giant agribusiness from the antitrust laws.

However, neither Section 6 nor Capper-Volstead contain restrictions on the size of growers who are exempted under the Acts. Moreover, the administrative law judge did not adequately distinguish *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203 (9th Cir. 1974), *cert. denied*, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974). He argued that Treasure Valley was a bargaining cooperative; thus the decision "left open" the question whether mere agreement about prices without any other form of cooperative activity falls within "collective marketing". *Treasure Valley* should not be read so narrowly. Indeed, the decision cites with approval the remarks of Mr. Seth Hufstedler of the Administrative Law Section of the American Bar Association, who stated that a Capper-Volstead cooperative "may fix prices". *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc., supra*, 497 F.2d at 216 n. 11.

12. Northern also relies on *United States v. Elm Spring Farm*, 38 F.Supp. 508 (D.Mass.1941), modified on other grounds, 127 F.2d 920 (1st Cir. 1942), where the court states that the mere establishment of a cooperative farm does not insulate the activities of its members from antitrust attack. But that case is completely distinguishable. It involved an attempt by a milk handler to evade a federal marketing order by a series of corporate reorganizations through which it tried to magically transform itself into an exempt producer cooperative *after* it had originally been ordered to comply with the marketing order. The Court just was not impressed with the defendants attempted magical transformation.

13. Section 5 of the Cooperative Marketing Act of 1926 reads:

"Persons engaged, as original producers of agricultural products, such as farmers, planters, ranchmen, dairymen, nut or fruit growers, acting together in associations, corporate or otherwise in collectively processing, preparing for market, handling, and marketing in interstate and/or foreign commerce such products of persons so engaged, may acquire, exchange, interpret, and disseminate past, present, and prospective crop, market, statistical, economic, and other similar information by direct exchange between such persons, and/or such associations or federations thereof, and/or by and through a common agent created or selected by them." 7 U.S.C. § 455.