**NORTH TEXAS PRODUCERS ASSOCIA-TION, Appellant,**

v.

**METZGER DAIRIES, INC., Appellee.**

No. 20956.

United States Court of Appeals
Fifth Circuit.

June 21, 1965.

Rehearing Denied July 16, 1965.

Ashton Phelps, New Orleans, La., William C. Odeneal, Jr., Odeneal & Odeneal, Dallas, Tex., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, ·La., Charles M. Lanier, New Orleans, La., Harold S. Nelson, San Antonio, Tex., of counsel, for appellant.

Paul S. Adams, Jr., Charles P. Storey, John K. Delay, Jr., Storey, Armstrong & Steger, Dallas, Tex., for appellee.

Stuart H. Russell, Oklahoma City, Okl., for the Central Arkansas Milk Producers Ass'n, Central Oklahoma Milk Producers Ass'n, Southwest Milk Producers Ass'n, Chattanooga Area Milk Producers Ass'n, Akron Milk Producers, Inc., and Shawnee Milk Producers Ass'n, amici curiae.

Frank D. Masters, San Antonio, Tex., for Producers Ass'n of San Antonio, Mid-Texas Milk Producers Ass'n, and Coastal Bend Milk Producers Ass'n, amici curiae.

Bradbury, Tippen, Brown & Clement, Abilene, Tex., for the Central West Texas Producers Ass'n, amicus curiae.

Before MARIS,[*] RIVES and BROWN, Circuit Judges.

RIVES, Circuit Judge:

Metzger Dairies, Inc. brought a civil action for treble damages [1] against North Texas Producers Association. The complaint charged violations of sections 2(e) and 3 of the Clayton Act, 15 U.S.C. §§ 13(e) and 14, and also of section 2 of the Sherman Act, 15 U.S.C. § 2. Upon the trial, Metzger abandoned any claimed violations of the Clayton Act and the case was submitted to the jury solely on the charge of violating section 2 of the Sherman Act.[2]

The complaint charged the Association with monopolizing and attempting to monopolize the marketing of raw milk in the Dallas-Fort Worth area by (a) control of the supply, (b) control of transportation, (c) refusal to transport milk for non-members of the Association, (d) boycott and coercion against Metzger, (e) covert attempt to purchase Metzger, (f) refusal to sell raw milk to Metzger unless Metzger stopped purchasing from Association's competitors, (g) purchase of other milk plants. The complaint claimed damages from the increased cost to Metzger of raw milk caused by the claimed predatory trade practices, and from the loss of profits from the sale of Metzger's dairy products resulting from boycotts induced by the Association in Wise and Hopkins Counties, Texas.

The Association denied the charges of monopolizing or attempting to monopolize and denied Metzger's claimed damages. It insisted that its operations were simply legitimate marketing procedures, by which it served the interest of its members, within the protection of section 6 of the Clayton Act [3] and of section 1 of the Capper-Volstead Act.[4]

---

[*] Of the Third Circuit, sitting by designation.

1. Under 15 U.S.C. § 15.

2. "§ 2. *Monopolizing trade a misdemeanor; penalty*

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2.

3. "§ 17. *Antitrust laws not applicable to labor organizations*

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." 15 U.S.C.

4. "§ 291. *Authorization of associations; powers*

"Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have

The original complaint was filed August 24, 1959. On May 2, 1960, the Supreme Court in the case of Maryland and Virginia Milk Producers Association v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 settled the basic principles of law which control the decision of this case. It was there held that section 6 of the Clayton Act and section 1 of the Capper-Volstead Act did not immunize cooperative associations from the anti-monopolization provisions of section 2 of the Sherman Act. Mr. Justice Black speaking for the Court stated the law in plain and simple language which can be understood by laymen and lawyers alike:

"  *  *  *  Thus, the full effect of § 6 [of the Clayton Act] is that a group of farmers acting together as a single entity in an association cannot be restrained 'from lawfully carrying out *the legitimate objects* thereof' (emphasis supplied), but the section cannot support the contention that it gives such an entity full freedom to engage in predatory trade practices at will.  *  *  *

"  *  *  *  We believe it is reasonably clear from the very language of the Capper-Volstead Act, as it was in § 6 of the Clayton Act, that the general philosophy of both was simply that individual farmers should be given, through agricultural cooperatives acting as entities, the same unified competitive advantage—and responsibility—available to businessmen acting through corporations as entities."

Maryland and Virginia Milk Producers Association v. United States, 1960, 362 U.S. 458, 465, 466, 80 S.Ct. 847.

marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: *Provided, however*, That such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements:

"First. That no member of the association is allowed more than one vote be-

The first trial of this case was set for Monday, December 4, 1961. On the preceding Friday, December 1, 1961, the Association as plaintiff filed a separate complaint for treble damages under the antitrust laws against Metzger and its alleged co-conspirators. That complaint charged in part:

"Defendants carried their plan and conspiracy into effect beginning in October 1958 and continuing to this date by transporting raw milk from Kansas and surrounding areas to the Dallas, Texas, area in quantities in excess of Five Million (5,-000,000) pounds per month, which was processed and sold in the North Texas area by Defendant, Metzger Dairies, Inc."

The transportation of raw milk from Kansas and surrounding areas to Metzger's plant in Dallas was thus involved in both suits. Nonetheless, trial of the present case commenced on the day set and the case was submitted to the jury ten days later, on December 14, 1961. The jury deliberated for approximately a day and a half and reported to the court that it was unable to reach a decision. The court then read to the jury, without objection by either party, the so-called "dynamite charge" employed in Allen v. United States, 1896, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528. After deliberating for another hour and twenty minutes, the jury returned a verdict for the defendant Association.

The court denied the motion of the defendant Association for the entry of judgment on that verdict and, instead ordered

cause of the amount of stock or membership capital he may own therein, or,

"Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

"And in any case to the following:

"Third. That the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members." 7 U.S.C.

" * * * that the motion of Plaintiff for new trial be granted on the grounds that, considering the evidence as a whole and weighing it, the Court is of the opinion that the verdict of the Jury is wrong and is contrary to the weight of the evidence, and for the further reason that the Court is of the opinion that error was committed in statements made by the Court to the members of the Jury after the Jury had indicated in writing that they were unable to reach a verdict, which statements by the Court had the effect of coercing the verdict.

"It further appears to the Court that Civil Action No. 8989, styled North Texas Producers Association vs. Jacob Metzger, et al, now pending in the United States District Court for the Northern District of Texas at Dallas, involves common questions of law and fact with this cause and, it is

"ORDERED that Civil Action No. 8989 be consolidated with this Civil Action No. 8271."

A year and a half later the case went to trial for the second time, along with the consolidated cross action. The Association dismissed from its cross action all defendants except Metzger Dairies, Inc. and Jacob Metzger. The court ruled as a matter of law that the cross complaint should not be submitted to the jury and that judgment be entered that the Association take nothing in its cross action. The appellant Association makes no complaint as to that ruling.

The jury returned a verdict for the plaintiff Metzger Dairies, Inc., and assessed its damages at $365,000. The court entered judgment for treble that sum or $1,095,000, plus attorney's fees in the sum of $25,000, costs, and interest.

On appeal, the first insistence is that the district court erred in granting plaintiff's motion for a new trial and in refusing to grant defendant's motion for judgment on the verdict at the conclusion of the first trial. Ordinarily an order granting a motion for new trial is not appealable. It is, however, reviewable on appeal from the final judgment following the second trial.[5] The scope of review is extremely limited because of the very broad discretion vested in the district judge.[6]

The district judge was quite frankly of the opinion that on the first trial the verdict should have gone for the plaintiff.[7] The jury had reported in writing that, "We the jury are unable to reach a decision." Neither party having objected, it cannot be said that the reading of the Allen charge was an abuse of discretion on the part of the district judge.[8] When, however, under all the circumstances, the judge concluded that the giving of that charge had the effect of coercing the jury and of causing it to return an unjust verdict, it became his duty to grant a new trial. In so doing, he did not abuse the broad discretion vested in him.

We come then to consider whether the practices complained of and established by the evidence were monopolistic or attempts to monopolize proscribed by section 2 of the Sherman Act, or were no more than "lawfully carrying out the legitimate objects" of an agricultural cooperative permitted by section 6 of the Clayton Act and by the Capper-Volstead

---

5. 3 Barron & Holtzoff, Federal Practice & Procedure, § 1302.1.

6. Marsh v. Illinois Cent. R. Co., 5 Cir. 1949, 175 F.2d 498, 499; Willitt v. Purvis, 5 Cir. 1960, 276 F.2d 129, 132; 6 Moore, Federal Practice, 2d ed. p. 3820.

7. "Now, I thought when the jury was hung, that after so long a trial and so much involved, and the labor and expense of another trial, that the jury might be doing both parties a favor by trying to get together, and I virtually told them so. If I had thought at the moment that it was a question of liability, I would have refrained from it, but I thought it was a question of the amount."

8. Silverman v. Travelers Ins. Co., 5 Cir., 1960, 277 F.2d 257, 264.

Act. As has been mentioned, the Supreme Court in Maryland and Virginia Milk Producers Association v. United States, supra, has now settled the principle that farmers may act together in a cooperative association, and the *legitimate objects* of mutual help may be carried out by the association without contravening the antitrust laws, but that otherwise, the association acts as an entity with the same responsibility under section 2 of the Sherman Act as if it were a private business corporation.

With that principle in mind, we briefly recapitulate the facts which the jury could reasonably believe from the evidence. During the period in controversy the Association had about 2500 dairy producer members, nearly all located in the North Texas area. About 40 members were located in Oklahoma. The Association supplied about 85 or 90 per cent of the raw milk marketed in the Dallas-Fort Worth area. Metzger Dairies, Inc. owns and operates a large milk plant in Dallas. Prior to September 1, 1958, Metzger purchased 75 per cent or more of its raw milk supply from the Association and the remainder from individual dairy farmers.

The Association owned and operated surplus milk plants at Muenster and Sulphur Springs, Texas, whose function was to convert milk which could not be sold into condense, cheese, butter and other products which are sold at the surplus or lower price. The operation of these surplus milk plants seems clearly a legitimate marketing function. In the spring of 1961 the Association acquired Vandervoort's Dairy, a milk processing plant in Fort Worth similar to Metzger's plant in Dallas. The damages allowed to Metzger from the increased cost of milk had resulted, however, prior to the time that the Association acquired Vandervoort's.

The Association owned or leased a fleet of refrigerated tank trucks for the transportation of its members' milk from their dairy farms to the various handling plants. Two individuals, C. B. Higgins and Sam Bloss, operated several flat trucks in which they hauled milk in cans from members and nonmembers of the Association to the Metzger plant.

The prevailing price of raw milk in the Dallas-Fort Worth area prior to September 1, 1958 was $5.30 per cwt., the minimum price established by an order of the Federal Market Administrator.[9] September 1, 1958 fell on Monday, Labor Day. On the preceding Friday, August 29, the Association announced by telegram to Metzger and the other milk distributors in the Dallas-Fort Worth area that beginning with deliveries made September 1, 1958 and continuing through February 28, 1959 its price for raw milk would be 30 cents per hundred pounds higher than the price announced by the Federal Market Administrator. The telegram closed with the request, "In the event you do not wish to purchase milk from the Association and/or its members at the quoted price we shall appreciate it if you would notify us immediately."

John Field, who was at the time of the price increase a member of the Board of Directors of the Association, testified that the Board voted to raise the price upon the recommendation of one of the attorneys for the Association, and that:

"He said that all the handlers on the Dallas-Fort Worth Market or the North Texas Market would pay the price, he was positive, with the exception of possibly Jake Metzger, and that the reason that they would pay it was that the milk was not available elsewhere or out of state."

Metzger and three other handlers—Foremost, Borden's and Cabell's—refused to pay the increased price. Within two weeks all of them agreed to pay the increased price. Cabell's President testified:

"Due to the extreme penalty and cost on most milk being bought from

---

9. See 7 U.S.C. § 608c (5); United States v. Rock Royal Co-Operative, Inc., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446.

the Midwest, because of transportation costs, and since there had been no change in the resale price of such milk, the company could not remain solvent any longer if such a high penalty was paid for its raw milk supply. The corporation, therefore, capitulated to the demands of the Association."

It was stipulated that Metzger claimed no damages for the period from September 1 to September 13 when Metzger offered to pay the increased price. Metzger's offer was discussed by the Executive Board of the Association and the Association refused to sell milk to Metzger except upon certain conditions, according to the testimony of Board Member John Field:

"A. Well, there was two fellows hauling milk to Metzger Dairies named Bloss and Higgins that would never lease their trucks to the co-op. And they were hauling milk. And they wanted these two trucks leased.

"Q. Who wanted them?

"A. The co-op.

"Q. All right.

"A. Wanted these trucks leased. And they wanted Mr. Metzger to stop bringing milk in from out of state.

"Q. All right. Was it stated that these were the conditions that had to be satisfied before milk could be sold to Metzger?

"A. Yes."

The Association's response to Metzger's offer to pay the increased price was first made orally by its General Manager, and was reiterated by letter dated September 29, 1958, reading in part:

" * * * In order to clear this matter, we thought it might be well to re-state the conditions under which the Association would be glad to resume deliveries to the Metzger plant.

"1. Metzger would pay the same price for milk as are all other handlers in the market—the September Federal Order Class I price plus 30¢ per hundred through February 1959. No premium would be paid on milk sold in other markets where a premium has not been announced.

"2. Association member milk would be delivered to the Metzger plant in Association owned or leased vehicles—except the Corsicana load.

"3. No additional producers milk would be taken on by the Metzger plant without approval of the Association—the same agreement that has been made with all other handlers in the market."

Metzger refused to accede to those conditions and purchased its raw milk elsewhere at considerably higher prices for the milk delivered at Metzger's plant.

The Association made several ineffective efforts to stop Metzger's alternate sources of supply. It also made an unsuccessful effort to purchase Metzger Dairies. The Association's General Manager at first instructed the broker not to tell Metzger whom he was representing. The broker testified that he met with the President, the General Manager, and several other members of the Association, and heard them discuss why they wanted to purchase Metzger Dairies.

"A. I believe there was a statement made why they wanted to purchase it.

"Q. All right, sir, and what were those statements?

"A. That if they could get Jake Metzger out of the dairy business, they could control the price of milk in this area."

Metzger suffered from boycotts of grocers handling its milk in two counties in which dairying was the principal industry. In Wise County all of Metzger's sales were lost. In Hopkins County Metzger lost a large part of its sales. There was ample evidence to trace these

boycotts back to instigation by the Association. The evidence discloses discussion of the boycotts at Board meetings and payment by the Association for a newspaper advertisement signed by a member calling a meeting at which Mr. Connally, a Director of the Association, made a speech.

"Q. And what did Mr. Connally say, as best you recall?

"A. Well, he told us to get Metzger's milk throwed out of the stores and we asked him if it was being worked from all over the territory. It wouldn't do any good to throw it out of Sulphur Springs if we didn't work it all over the territory. And he said it was being worked throughout the territory."

The Association also circulated a letter to its members bearing the signature of John Field, a Board Member, calling attention that "Metzger is still shipping in milk from the north and paying up to 75¢ per hundred more for some of it than is being paid for local milk." The letter concluded: "We would like to urge all members to talk with their friends, neighbors, grocers and business associates and suggest to them that they buy milk from a plant that distributes local milk—not northern milk."

■ We conclude that the jury could reasonably find from the evidence that the Association engaged in monopolistic practices or attempts to monopolize proscribed by section 2 of the Sherman Act.

■ The Association insists that the damages awarded by the jury were not justified by the evidence. We do not agree. Within the principles as to proof of damages in antitrust cases recently restated by this Court in North Texas Producers Association v. Young, 5 Cir. 1962, 308 F.2d 235, 244, 245, there was ample evidence to support the jury's verdict assessing damages at $365,000. Metzger did not seek to recover damages for future loss of profits nor for permanent damage to its business, but supported its claim for actual lost profits by detailed exhibits prepared from its books and records and summarized as follows:

"SUMMARY—Lose of Profit to

Metzger Dairies

| | | |
|---|---|---|
| "1. | Increased Cost of Milk —Sept. 14, 1958 to Oct. 31, 1960 | $364,974.42 |
| "2. | Profit on Sales Losses, Wise County, Sept., 1958 to June 15, 1963 | 82,034.24 |
| "3. | Profit on Sales Losses, Hopkins County, Oct., 1958 to June 15, 1963 | 53,389.11 |
| "4. | Increased Production, Acquisition Cost, Sept. 1958 to Oct., 1961 | 10,170.49 |
| "5. | Loss on Hauling Operations, Jan., 1959 to Apr., 1963 | 96,289.31 |
| "Total Loss of Profit | | $606,857.57" |

■ The Association annexes to its brief a copy of its motion filed in the district court for judgment notwithstanding the verdict or for a new trial, and in a page and a half of its brief urges reversal for one or more of the claimed procedural errors relied on in the 52 grounds of its motion. We decline both because the brief fails to comply with Fifth Circuit Rule 24, subd. 2(b) and (c) and because we find no procedural error which affects the substantial rights of the parties and necessitates reversal. See Rule 61, Fed.R.Civ.P.

■ The appellee Metzger complains that the $25,000 fixed by the district court as plaintiff's attorney's fees is low and unreasonable and that the amount was fixed without opportunity for a hearing. However, Metzger's counsel did not request a hearing. Instead, when the district court stated: "The Court will assess an attorney fee

in the amount of $25,000. The lawyers have handled this case throughout all of its phases, and I will announce a fee of $25,000," Metzger's counsel replied simply, "Thank you, Your Honor." Moreover, in the absence of a cross-appeal, this Court cannot enlarge the rights of the appellee.[10]

Appellee Metzger also prays that additional attorney's fees be awarded for services relating to this appeal. The statute upon which this action is based provides that the cost of suit include a reasonable attorney's fee, 15 U.S.C. § 15. We fix the sum of $10,000 as reasonable for the services of appellee's attorneys upon this appeal and direct that said sum be included and taxed as part of the costs in this Court.[11]

The judgment is

Affirmed.

10. The William Bagaley, 1866, 72 U.S. 377, 412, 5 Wall. 377, 18 L.Ed. 583; United States v. American Ry. Express Co., 1924, 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087; Morley Construction Co. v. Maryland Casualty Co., 1937, 300 U.S. 185, 191, 57 S.Ct. 325, 81 L.Ed. 593; Helvering v. Pfeiffer, 1937, 302 U.S. 247, 251, 58 S.Ct. 159, 82 L.Ed. 231; Le Tulle v. Scofield, 1940, 308 U.S. 415, 422, 60 S. Ct. 313, 84 L.Ed. 355; Southern Bell Telephone Co. v. Southern Precision Pattern Works, 5 Cir. 1958, 251 F.2d 537, 540;

Abel v. Brayton Flying Service, 5 Cir. 1957, 248 F.2d 713, 717; Schildhaus v. Moe, 2 Cir. 1963, 319 F.2d 587, 588; Zellinger v. Uvalde Rock Asphalt Co., 10 Cir. 1963, 316 F.2d 47, 54; 7 Moore, Federal Practice ¶72.05 (2d ed. 1953).

11. North Texas Producers Association v. Young, 5 Cir. 1962, 308 F.2d 235, 246; Twentieth Century Fox Film Corporation v. Goldwyn, 9 Cir. 1964, 328 F.2d 190, 226.