[No. 46549.   En Banc.   April 3, 1980.]

GOLOB & SONS, INC., ET AL, *Respondents,* v. SCHAAKE PACKING CO., INC., ET AL, *Petitioners.*

DONALD EVANS, ET AL, *Respondents,* v. SCHAAKE PACKING CO., INC., ET AL, *Petitioners.*

*Lane, Powell, Moss & Miller,* by *Stephen J. Hill, Matthew R. Kenney,* and *Ralph H. Palumbo, Schweppe, Doolittle, Krug, Tausend & Beezer,* by *Fredric C. Tausend* and *James B. Street, Perkins, Coie, Stone, Olsen & Williams,* by *Richard E. Williams,* and *Sax & MacIver,* by *Philip E. Cutler,* for petitioners Schaake Packing Co., et al.

*Ferguson & Burdell,* by *Thomas J. Greenan* and *Scott B. Osborne,* for petitioners Columbia Foods, Inc., et al.

*Culp, Dwyer, Guterson & Grader,* by *William L. Dwyer, Richard C. Yarmuth,* and *Robert D. Stewart,* for respondents.

*Slade Gorton, Attorney General, Thomas L. Boeder, Senior Assistant,* and *Earle J. Hereford, Jr., Assistant,* amici curiae.

UTTER, C.J.—These consolidated antitrust cases were brought by respondent cattle feeders against petitioner meat packers under the Washington Consumer Protection Act. The meat packers filed counterclaims, alleging that the cattle feeders had conspired in restraint of trade and engaged in unfair trade practices in violation of the Consumer Protection Act. The trial court granted partial summary judgment and dismissed the meat packers' counterclaims on the ground that the cattle feeders were "farmers" or "ranchmen" and as such qualified for the agricultural exemption to the Washington antitrust laws.

We granted review of the dismissal of the counterclaims, and affirm the trial court.

The cattle feeders, all of whom own feedlot facilities and feed cattle for themselves or others, commenced these two separate but identical lawsuits, consolidated for all purposes, against the beef packers. They alleged that the meat packers combined and conspired in restraint of trade, engaged in unfair trade practices, and conspired to monopolize, attempted to monopolize, and actually monopolized the Washington fat cattle industry in violation of the Washington Consumer Protection Act. Petitioner meat packers filed counterclaims, contending that the cattle feeders had violated the Consumer Protection Act by conspiring to raise the price for fat cattle.

The alleged conspiracy of the cattle feeders consisted of participation in weekly Tuesday morning telephone conference calls, beginning in the summer of 1967 and continuing until late 1975. During the calls, participants discussed past, current, and future price trends for fat cattle and numbers of fat cattle they would have ready for sale in coming weeks. All of the conference call participants fed cattle they purchased from ranchers who had cow–calf operations. The ranchers raised these cattle, known in the industry as feeder cattle, either on pasture or in pens until they were roughly 1 year old and weighed at least 600 pounds. After purchase from ranchers, the cattle feeders placed the cattle in feedlots and fed them on concentrated, high protein growing rations for approximately 120 to 150 days, at which time the cattle were what is known as "fat" cattle and were ready for sale to meat packers.

To determine whether the activities of respondent cattle feeders are within the scope of the agricultural exemption, it is necessary to examine the legislative history of the antitrust statutes. Washington's comprehensive antitrust law, the Consumer Protection Act, RCW 19.86, closely parallels federal antitrust laws. Our state statute was enacted in 1961, partly in response to a national movement spearheaded by the antitrust division of the United States

Department of Justice to encourage states to join with the federal government in the vigorous pursuit of antitrust goals. The agricultural exemption appears twice in Washington antitrust statutes. RCW 19.86.070 provides:

> The labor of a human being is not a commodity or article of commerce. Nothing contained in this chapter shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof.

RCW 24.34.010, enacted as part of the state's Capper–Volstead Act in 1967, provides:

> Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut growers or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in intrastate commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: *Provided,* That such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements:
>
> First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or,
>
> Second. That the association does not pay dividends on stock or membership capital in excess of eight percent per annum.
>
> And in any case to the following:
>
> Third. That the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members.

The language of RCW 24.34.010 requires a number of tests to be met before an exemption is recognized. There must be an organization or association. Its members must be farmers, planters, ranchmen, dairymen, nut growers or fruit growers. It must be instituted for the mutual help or

benefit of its members. Its voting or dividend payment policy must conform to statutory requirements and it must not deal more in nonmember products than in member products. Petitioner meat packers contend that the first two requirements are not met in the case of the cattle feeder conference call participants. The meat packers argue that cattle feeders are not "farmers" or "ranchmen" within the meaning of the statutes. The meat packers also contend that the only element of "organization" that may be attributed to the cattle feeders' cooperative effort is the regular participation in activities allegedly violative of antitrust laws, which activities, standing alone, should not qualify them for the exemption.

To understand the state exemptions, it is helpful to examine the legislative history of their federal counterparts, section 6 of the Clayton Act, 15 U.S.C. § 17, and section 1 of the Capper–Volstead Act, 7 U.S.C. § 291. Congress enacted section 6 of the Clayton Act in 1914 in response to judicial decisions enforcing antitrust requirements against agricultural cooperatives. *See Maryland & Va. Milk Producers Ass'n v. United States,* 362 U.S. 458, 464, 4 L. Ed. 2d 880, 80 S. Ct. 847 (1960). As the United States Supreme Court has recounted,

> Farmers were perceived to be in a particularly harsh economic position. They were subject to the vagaries of market conditions that plague agriculture generally, and they had no means individually of responding to those conditions. Often the farmer had little choice about who his buyer would be and when he would sell. A large portion of an entire year's labor devoted to the production of a crop could be lost if the farmer were forced to bring his harvest to market at an unfavorable time. Few farmers, however, so long as they could act only individually, had sufficient economic power to wait out an unfavorable situation. Farmers were seen as being caught in the hands of processors and distributors who, because of their position in the market and their relative economic strength, were able to take from the farmer a good share of whatever profits might be available from agricultural production.

*National Broiler Marketing Ass'n v. United States,* 436 U.S. 816, 825–26, 56 L. Ed. 2d 728, 98 S. Ct. 2122 (1978). Section 6 of the Clayton Act exempted agricultural organizations from antitrust laws so as to allow farmers to act together in cooperatives for the lawful accomplishment of legitimate objectives. *Maryland & Va. Milk Producers,* at 464–66. "By allowing farmers to join together in cooperatives, Congress hoped to bolster their market strength and to improve their ability to weather adverse economic periods and to deal with processors and distributors." *National Broiler,* at 826.

The Clayton Act exemption, however, proved to be insufficient. Under the Clayton Act, only nonstock organizations were exempt from the antitrust requirements. Agricultural groups had discovered that accumulation of capital was necessary in order to best serve the needs of their members. *National Broiler,* at 824. Accordingly, in 1922, Congress enacted the Capper–Volstead Act to extend the benefits of the Clayton exemption to capital stock agricultural cooperatives. *Maryland & Va. Milk Producers,* at 466; *National Broiler,* at 824–25. The Capper–Volstead provision did not replace the Clayton Act provision, but rather expanded the original Clayton exemption so as to achieve the fundamental goal of bolstering the economic strength of farmers.

In establishing these protections for "farmers," Congress did not intend to aid "the full spectrum of the agricultural sector." *National Broiler,* at 826. The legislative debates concerning the statutes reveal that Congress intended to extend the protections of the legislation only to "actual producers of agricultural products." *Case–Swayne Co. v. Sunkist Growers,* 389 U.S. 384, 391–92, 19 L. Ed. 2d 621, 88 S. Ct. 528 (1967); *see* 62 Cong. Rec. 2052 (1922) (remarks of Senator Kellogg); 60 Cong. Rec. 369 (1920) (remarks of Senator Lenroot); *see also* H.R. Rep. No. 627, 63d Cong., 2d Sess. 14–16 (1914). "Middlemen" in the agricultural process, such as packers and processors, cannot claim the

benefits of the agricultural exemption. *National Broiler,* at 826–27; *Case–Swayne,* at 391–93.

Petitioner meat packers cite the decisions of the United States Supreme Court in *National Broiler* and *Case–Swayne* as authority for the proposition that the cattle feeders are merely "middlemen" and therefore cannot invoke the protections of the agricultural exemption. In *National Broiler,* the court held that producers of broiler chickens who merely processed the slaughtered poultry for the retail market were "middlemen" and did not come within the agricultural exemption. In *Case–Swayne,* the court similarly held that the exemption did not apply to associations which merely processed citrus fruit into juice and citrus concentrates.

■■ Agriculture has changed substantially over the last 50 years. Now agricultural operations are frequently very specialized, with different aspects of an agricultural commodity's production being accomplished by different individuals or enterprises. Cattle feeders today serve precisely the same function in raising, caring for, and marketing cattle that earlier ranchers did. The major difference is that now cattle are often fattened in enclosed pens, rather than on the open range. Such a change is not significant for the purpose of the exemption statutes. It is also not significant that feeders acquire some of their calves from other farmers. Farmers generally acquire some seed, feed, young animals, and various additional products from others without losing their status as farmers. Thus, respondent cattle feeders would be "farmers" and not "middlemen" under the analysis applied by the United States Supreme Court in *National Broiler* and *Case–Swayne.* Unlike the poultry producers in *National Broiler* and the orange juice producers in *Case–Swayne,* the cattle feeders are primarily engaged in the raising of an agricultural product.

Our state antitrust laws are patterned after their federal counterparts and we are guided by the same policy considerations. Accordingly, the cattle feeders in this case qualify

for the state exemptions and may form agricultural organizations within the meaning of RCW 19.86.070 and RCW 24.34.010.

■ Petitioners further argue that even if the group of conference call participants would have otherwise qualified as "farmers," the participation of the D & E Livestock Company in the conference phone calls caused the organization to lose its exempt status. Petitioners maintain that, after 1974, D & E Livestock could not be considered a "farmer" because its operation consisted solely of feeding cattle owned by others, for which the company was compensated on an agreed basis—a practice known as "custom feeding." However, there appears to be no valid reason for distinguishing between custom feeders and other cattle feeders for purposes of determining who is a "farmer" under the exemption. D & E Livestock is a "producer" and is not the type of "predatory middleman" that Congress intended to exclude from the agricultural exemption.

The petitioner meat packers next argue that even if cattle feeders are farmers for purposes of the agricultural exemption, their informal organizational efforts fall short of the level of formality necessary to qualify their group for the exemption. The meat packers contend that the kind of organizations Congress intended to exempt when it enacted the Capper–Volstead Act were cooperatives formed under state law.

■ We must remember, however, that Capper–Volstead was enacted to *extend* the agricultural exemption to *capitalized* cooperatives, not to limit it to rigidly structured organizations comparable to corporations formed under state law. As Congressman Volstead pointed out when speaking in support of the act:

> The object of this bill is to modify the laws under which business organizations are now formed, *so that farmers may take advantage of the form of organization that is used by business concerns.*

(Italics ours.) 61 Cong. Rec. 1033 (1921). The legislative

history of the act reveals that although the sponsors of Capper–Volstead may have assumed that farmers would most frequently join in cooperatives, these legislators did not intend to declare that cooperatives were the only form in which farmers' groups could organize. *See Northern Cal. Supermarkets, Inc. v. Central Cal. Lettuce Producers Coop.*, 413 F. Supp. 984, 988 (N.D. Cal. 1976), *aff'd*, 580 F.2d 369 (9th Cir. 1978). Thus, as the court observed in *Northern Cal. Supermarkets* at page 988,

> The structural requirements for Section 6 exemptions are not stringent. An agricultural organization without capital stock, instituted for mutual self–help and not conducted for profit, qualifies for the exemption.

Applying this reasoning by analogy to the state statutory provisions, it is apparent that the cattle feeders who participated in the conference phone calls did not need to form a cooperative to qualify for the exemption.

The amount of organizational structure actually present in this case is best understood by examining the history of the phone calls forming the basis of the organization. The history of the weekly conference calls is intertwined with the history of Cattle Fax, a national cattle market reporting system.

Cattle Fax was established in the late 1960's by the American National Cattlemen's Association (ANCA), a national association of cattle producers. Cattle Fax gathers sales and inventory data from its members and in turn disseminates both national and regional market information to them. Membership in Cattle Fax is limited to actual producers of livestock. Prior to initiating the Cattle Fax operation, ANCA sought and received clearance for the system from the United States Department of Justice. In its letter to the Department of Justice, ANCA stated that the purpose of its request to the department was to insure that cattle feeders do in fact fall within the agricultural exemption. The Department of Justice indicated in February 1968

that it had no objection to the Cattle Fax system for providing cattle feeders with more accurate market information, so long as the membership was limited to ranchers and cattle feeders.

After ANCA received clearance for the Cattle Fax system, Ron Baker, an Oregon cattle feeder and a member of the ANCA committee that established Cattle Fax, decided to organize a group of feedlots and set up weekly conference calls during the period before Cattle Fax became fully functional in the Northwest. Participants in the calls were told that the concept had been approved by the Department of Justice. Interest in the calls dwindled after Cattle Fax became fully operational in the Northwest and the calls were discontinued in 1975 for lack of participation. Cattle Fax subscribers thereafter received information by telephoning individually the Cattle Fax office.

After Cattle Fax began operations in the Northwest, in about 1970, all participants in the conference calls were in fact Cattle Fax members. Petitioners argue that the conference calls were not "sponsored" by Cattle Fax, and, therefore, even if Cattle Fax is an exempt organization, the calls were not exempt activity. Respondents, however, argue, and the trial court agreed, that the participants in the calls were an exempt group regardless of the status of Cattle Fax and, as such, they had a statutory right to exchange market information.

The cattle feeder participants in the conference calls were, indeed, an exempt group and the trial court correctly rejected the meat packers' argument that the cattle feeders' group was not exempt because it failed to meet formal organizational requirements. As the trial court correctly concluded, the meat packers' argument "exalts form over substance." The loose structure of the group in question hère should not, by itself, prevent the group from qualifying for the exemption. It would be anomalous to require agricultural groups to organize and engage in practices even

more anticompetitive than price–fixing in order to qualify for the exemption. *See, e.g., Northern Cal. Supermarkets, Inc. v. Central Cal. Lettuce Producers Coop., supra* at 992 (finding that the agricultural exemption applies to an organization which engages in price–fixing, even if the organization does not employ any other collective marketing activities); *Fairdale Farms, Inc. v. Yankee Milk, Inc.,* No. 75–140 (D. Vt., filed Nov. 1, 1979) (holding that the exemption applies to a parent cooperative that merely coordinated the price–fixing activities of its member cooperatives). An organization which meets the explicit statutory requirements and puts farmers in a more favorable bargaining position is exempt, regardless of the manner in which the farmers secured the more favorable bargaining position. *Fairdale Farms, Inc. v. Yankee Milk, Inc., supra; Central Cal. Lettuce Producers Coop.,* [1976–79 Transfer Binder] Trade Reg. Rep. (CCH) ¶ 21,337.

Respondent cattle feeders met the explicit statutory requirements of RCW 19.86.070 and RCW 24.34.010. Their conference calls, even if the sole activity of the group, put them in a more favorable bargaining position with respect to large buyers. Accordingly, they formed an exempt agricultural organization under our state antitrust statutes, and the trial court was correct in dismissing the meat packers' counterclaims against the cattle feeders.

█ Finally, we reject the meat packers' argument that we should construe our state exemptions more narrowly than their federal counterparts. Although there are some minor differences between the state and federal statutes, they are not significant. In addition, in RCW 19.86.920 the state legislature specifically instructed that federal precedent should be followed in interpreting the state statutes. RCW 19.86.170 also provides that any activity permitted under statutory authority of the United States shall be exempt from Washington antitrust laws.

268

The trial court's order dismissing petitioner meat packers' counterclaims is affirmed and the case is remanded for trial.

ROSELLINI, STAFFORD, WRIGHT, BRACHTENBACH, HOROWITZ, DOLLIVER, HICKS, and WILLIAMS, JJ., concur.

Reconsideration denied June 5, 1980.