[No. 47828–7.   En Banc.   March 4, 1982.]

CONSOLIDATED DAIRY PRODUCTS COMPANY, *Appellant,*
v. BAR–T RANCH DAIRY, INC., *Respondent,*
NORTHWEST DAIRYMEN'S ASSOCIATION,
ET AL, *Appellants.*

*Sax & MacIver,* by *James L. Magee, Philip E. Cutler,*

and *James P. Donohue,* for appellants.

*Reed, Otterstrom & Giesa, P.S.,* by *John P. Giesa* and *Michael J. Casey,* for respondent.

*Kenneth O. Eikenberry, Attorney General,* and *John R. Ellis, Jon P. Ferguson,* and *James M. Beaulaurier, Assistants,* amici curiae for respondent.

ROSELLINI, J.—This action began as a suit by Consolidated Dairy Products Company (Consolidated) (a nonprofit Washington corporation which operates on a cooperative basis, functioning as a marketing agent for a federated group of dairy farmer associations and owning some processing plants) to recover a sum owed by one of its customers, Bar–T Ranch Dairy (Bar–T) (a noncooperative milk processing Washington corporation). Bar–T cross–complained for damages allegedly resulting from antitrust law violations, joining Northwest Dairymen's Association (NDA), also a cooperative, as a codefendant.

Judgment was entered for Consolidated on its claim against Bar–T. Consolidated and NDA moved for summary judgment dismissing the statutory claims, contending that the activities complained of by Bar–T were exempt from antitrust suits under the Capper–Volstead Act, 7 U.S.C. §§ 291, 292, which has a state counterpart in RCW 24.34. *Golob & Sons, Inc. v. Schaake Packing Co.,* 93 Wn.2d 257, 609 P.2d 444 (1980). This motion was denied.

At the conclusion of the lengthy trial, the court gave Bar–T's requested instructions on the law of "monopolization" in antitrust suits, but refused all of the cooperatives' requested instructions pertaining to the Capper–Volstead exemption, save for the following:

> You are instructed that persons engaged in the production of agricultural products as farmers may act together in cooperative associations and may have marketing agencies in common. Under a federal statute, the mere act of cooperatives combining for marketing purposes, without more, is not a violation of the antitrust laws.

Instruction 24. The jury returned a verdict in the amount of $195,515.51 against the cooperatives, finding that they had monopolized the relevant market, and had engaged in unfair methods of competition. The trial court doubled this amount as punitive damages, and awarded Bar–T attorney fees in double the amount its attorneys would have earned had they been paid on an hourly basis. Motions for judgment notwithstanding the verdict or a new trial were denied.

We find meritorious the cooperatives' contention that they were entitled to judgment notwithstanding the verdict and do not reach other errors assigned.

Consolidated is owned by a holding company, United Dairymen's Association (UDA) (which in turn is owned by a number of dairy cooperatives, including NDA, which is its major shareholder, and Inland Empire Dairymen's Association (IEDA)). All are nonprofit cooperatives organized for the purpose of marketing milk products produced by their members. All of their earnings after operating expenses are paid are returned to the members, either in cash or in stock rotation.

The sale of milk is regulated by the United States Department of Agriculture, which issues orders promulgated according to certain standards and rules setting the *minimum* price to be paid the producers for their milk. This is done pursuant to the requirements of federal agricultural marketing laws. Milk sold for processing brings a lesser price than milk sold for bottling and fluid consumption. The two prices are "blended" together, and the farmers supplying the milk are paid in ratio to their contributions of milk, so that all can share in the prices paid for fluid milk.

Historically, the need for federal regulation sprang from a number of circumstances, including the fact that milk production depends a great deal upon the events and conditions of nature (such as the cow's lactation season, and the fact that milk is highly perishable). It appears that the flow of milk to the market cannot be controlled on a short–

term basis. A lack of correlation between the ability to control production and consumer demand is typical of agricultural products which depend on the vagaries of nature. Thus a farmer may suffer economically from a very large yield (when the market will be flooded) or from a very small yield.

The federal marketing orders provide for: (1) payment by milk handlers of minimum prices to producers according to milk usage, (2) pooling of the differing values for the various uses of milk to achieve an average, or "blend" return for producers, (3) audit of handlers' books and records to verify reported utilization and producer price payments, and (4) payment of the cost of administering the orders by the handlers they regulate.

The minimum price set by the Department of Agriculture does not always allow for a profitable return to the farmer, because of events which transpire between the time an order is issued and the time it is revised. In 1974 NDA determined that the federal order price was not adequate and raised the price for its milk above the minimum authorized.[1] Such raises were countenanced by the department, and, according to one of its officials who testified on behalf of the cooperatives, the practice was relied upon by the department as a justification for not constantly changing the minimum price to meet changing conditions.

In the Spokane area, Consolidated's customers comprised most of the buyers of raw milk on the open market in the Inland Empire market area. IEDA, at the times involved in this lawsuit, marketed its own milk. It is not clear whether any of it was sold in the open market. Some milk was sold by farmers directly to processors under private contracts. Bar–T chose not to acquire its milk by private contract, but instead purchased it from Consolidated. Prior to 1973 it had purchased its milk from Spokane Milk Producers' Association (SMPA), which dissolved that year, with most

---

[1] While Consolidated is the marketing agent for NDA, the testimony was that each producer cooperative determines the price at which it will sell its milk.

of its members joining NDA. According to Bar–T's testimony, when Consolidated (on behalf of NDA) raised the price of its milk in September 1974, Bar–T found itself unable to make a profit on its sales to dealers, since the prices of other labels of milk in the stores were competitive.[2]

Bar–T endeavored to find a supply of milk elsewhere, putting an ad in the paper and making contact with an outside cooperative, National Farmers Organization (NFO), which offered to bring in milk from Boise at lower prices. However, Bar–T feared that delivery would be hampered by winter conditions on the road to Boise, and also that it could not be sure of the quality of milk offered by NFO or the dependability of that association as a supplier, should the price of Consolidated's milk go down (which it did after 7 months). Therefore, Bar–T decided to remain with Consolidated. Its sales were rapidly declining, however, as its milk was not moving in the stores. Consolidated's price dropped to the minimum by May 1975. Nevertheless, Bar–T's business continued to decline and in October 1976, it closed its doors.[3]

Prior to these events, Merrit Nash, the general manager of SMPA, which, although it was a member of UDA, marketed its own products, had begun a campaign to effect mergers with IEDA and with NDA. His enthusiasm for merger was shared by the leadership of NDA. There was a difference of opinion within the Spokane cooperatives as to whether it would be in their best interest to merge with the larger cooperative. The membership of IEDA was unwilling to merge with SMPA or NDA, believing its interests would be better served by a smaller organization. Eventually it

---

[2]There is no contention in this suit that Consolidated's processing activities were in unfair competition with Bar–T.

[3]The defendants' evidence showed that Bar–T packaged its milk in plastic bags, which frequently leaked, causing a high rate of rejection. Their theory was that the failure of Bar–T's business was due to poor management. But the jury evidently was not persuaded that this was the cause of Bar–T's losses.

merged with an Oregon cooperative, Mayflower.

In 1973, a vote was finally taken by SMPA and a union was effected with NDA by means of an "agreement and plan of reorganization", a method of reorganization evidently adopted on advice of counsel. Under this method, the assets of SMPA were sold to Consolidated. One respect in which this method of uniting differed from a true merger was that the members of SMPA did not automatically become members of NDA. They were free to join NDA or not, as they chose. However, manager Nash advised the former members of SMPA by letter that they had become members of NDA. Customers of SMPA, including Bar–T, also were sent letters to that effect.

The error in this advice was soon discovered, and the former members of SMPA were told that it would be necessary for them to sign membership agreements if they wished to join the cooperative. Over two–thirds of the members did so.

Bar–T presented evidence from which the jury could infer that Nash, in reporting to the Secretary of State, had misrepresented the number of yes votes cast by the membership, even though Nash offered a credible explanation of the discrepancy between the report to the Secretary and the original minutes of the meeting at which the votes were counted.

Bar–T introduced evidence that Consolidated had at one time advised SMPA that if it built a cheese factory, a possibility which it was considering, Consolidated would not market its cheese products. It had also refused to market SMPA's surplus milk, claiming lack of facilities, but did process powdered milk for that cooperative, although at distressed prices. After the SMPA members joined NDA, milk which they produced was processed and marketed by Consolidated.

Also, Bar–T introduced evidence that, after the reorganization of NDA and SMPA, Consolidated refused to honor an agreement which SMPA had made with IEDA to process some of its milk at SMPA's powder plant (which was

acquired by Consolidated in the reorganization).

Bar–T, however, expressly disavows any claim that these acts caused the business failure for which it sought and obtained damages in this action. Rather, its theory is that the dissolution of SMPA and the addition of its membership to the rolls of NDA enabled Consolidated to obtain monopoly power which in turn made it possible for it to exact a price for its milk which was higher than the federal order minimum, and that this in turn caused Bar–T's failure. It also claims that the raising of prices constituted a "predatory practice" known in the industry as "pool loading". Before discussing these theories, we will briefly examine the legal setting in which this case rests.

The cross complaint against the cooperatives, as it went to the jury, was based on RCW 19.86.020 and .040. They provide:

> Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

RCW 19.86.020.

> It shall be unlawful for any person to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce.

RCW 19.86.040.

Under RCW 19.86.090, any person injured in his business or property by a violation of these sections is entitled to bring an action for damages.

RCW 19.86.920 declares that the purpose of the act is to complement the federal body of law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices, and that the courts should be guided by the interpretation given by federal courts to comparable federal statutes. RCW 19.86.170 exempts actions or transactions permitted by regulatory agencies under authority of law. In *Golob & Sons, Inc. v. Schaake Packing Co.,* 93 Wn.2d 257, 609 P.2d 444 (1980), we observed that this provision exempts actions which are permitted by statute.

Under antitrust principles, it is generally illegal for an ordinary company to seek to acquire monopoly power consciously by means other than honest industrial effort. However, under section 6 of the Clayton Act (38 Stat. 731 (1914), 15 U.S.C. § 17 (1977)) and the Capper–Volstead Act, Congress has created one of its specific exemptions from this rule for policy reasons. The latter provides:

> Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen . . . may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: *Provided, however,* That such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements:
> First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or,
> Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.
> And in any case to the following:
> Third. That the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members. (Feb. 18, 1922, ch. 57, § 1, 42 Stat. 388.)

7 U.S.C. § 291.

> If the Secretary of Agriculture shall have reason to believe that any such association monopolizes or restrains trade in interstate or foreign commerce to such an extent that the price of any agricultural produce is unduly enhanced by reason thereof, he shall serve upon such association a complaint stating his charge in that respect,
> . . .
> . . .
> (Feb. 18, 1922, ch. 57, § 2, 42 Stat. 388.)

7 U.S.C. § 292. This court had the federal act and the

state's own "little Capper–Volstead Act" before it in *Golob,* where we held that a farmers' group need not be a cooperative formed under state law in order to qualify for the exemption. We said:

> An organization which meets the explicit statutory requirements and puts farmers in a more favorable bargaining position is exempt, regardless of the manner in which [it] secured the more favorable bargaining position.

*Golob,* at 267.

It was there alleged that the farmers had conspired to monopolize the industry and set prices. The history of the Capper–Volstead Act, the reasons for its enactment and the purposes it serves are set forth in that opinion. We noted that farmers had been perceived to be in a particularly harsh economic position,

> caught in the hands of processors and distributors who, because of their position in the market and their relative economic strength, were able to take from the farmer a good share of whatever profits might be available from agricultural production.

*Golob,* at 261, quoting from *National Broiler Mktg. Ass'n v. United States,* 436 U.S. 816, 825–26, 56 L. Ed. 2d 728, 98 S. Ct. 2122 (1978). We noted that by allowing farmers to join together in cooperatives, Congress hoped to bolster their market strength to improve their ability to weather adverse economic periods and to deal with processors and distributors, citing *National Broiler Mktg. Ass'n v. United States, supra,* which dealt with the Clayton Act, where the farmers' exemption was first introduced, being later extended in the Capper–Volstead Act to include capital stock agricultural cooperatives.

*Golob* makes it clear that organizations of farmers may combine with a view to obtaining a monopoly. This is now settled. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.,* 370 U.S. 19, 8 L. Ed. 2d 305, 82 S. Ct. 1130 (1962). *United States v. Maryland Coop. Milk Producers, Inc.,* 145 F. Supp. 151 (D.D.C. 1956); *see also Kin-*

*nett Dairies, Inc. v. Dairymen, Inc.*, 512 F. Supp. 608 (M.D. Ga. 1981); *GVF Cannery, Inc. v. California Tomato Growers Ass'n*, 511 F. Supp. 711 (N.D. Cal. 1981); 1 P. Areeda & D. Turner, *Antitrust Law* § 228d (1978); Hofstedler, *A Prediction: The Exemption Favoring Agricultural Cooperatives Will Be Affirmed*, 22 Ad. L. Rev. 455 (1969). The *Winckler* court said, at pages 28–29:

> There can be no doubt that under these statutes the 12,000 California–Arizona citrus growers ultimately involved could join together into *one* organization for the collective processing and marketing of their fruit and fruit products without the business decisions of their officers being held combinations or conspiracies. The language of the Capper–Volstead Act is specific in permitting concerted efforts by farmers in the processing, preparing for market, and marketing of their products. . . .

> Instead of a single cooperative, these growers through local associations first formed one area–wide organization (Sunkist) for marketing purposes. When it was decided to perform research and processing on a joint basis, separate organizations were formed by the interested associations for reasons outlined above. At a later date one of these (Exchange Orange) was acquired by the Sunkist organization and is presently held as a subsidiary. The other (Exchange Lemon) is still owned by the lemon–grower associations, all of whom are also member associations of Sunkist.

Holding that in practical effect this was one organization, the Court said that to hold otherwise

> would be to impose grave legal consequences upon organizational distinctions that are of *de minimis* meaning and effect to these growers who have banded together for processing and marketing purposes within the purview of the Clayton and Capper–Volstead Acts. There is no indication that the use of separate corporations had economic significance in itself or that outsiders considered and dealt with the three entities as independent organizations.

*Winckler*, at 29.

The Court declared at the end that its decision in no way

detracted from earlier cases holding agricultural cooperatives liable for conspiracies with outside groups, citing *United States v. Borden Co.,* 308 U.S. 188, 84 L. Ed. 181, 60 S. Ct. 182 (1939). *See also Treasure Vly. Potato Bargaining Ass'n v. Ore–Ida Foods, Inc.,* 497 F.2d 203 (9th Cir. 1974). There is no suggestion that there was such a conspiracy involved here.

In *Fairdale Farms, Inc. v. Yankee Milk, Inc.,* 635 F.2d 1037 (2d Cir. 1980), *cert. denied,* 454 U.S. 818, 70 L. Ed. 2d 88, 102 S. Ct. 98 (1981), the Second Circuit held that attempts to monopolize are not illegal unless they involve "predatory practices" such as boycotting, picketing and harassment, coerced membership and discriminatory pricing.

Bar–T, while it maintains that it was forced out of business because of the prices charged by Consolidated for the milk which it marketed, acknowledges that price setting alone is not sufficient to subject the defendants to liability under the Consumer Protection Act. Their theory, which prevailed in the lower court, was that Consolidated achieved its monopoly power through predatory acts on its part and on the part of NDA, by means of which they induced SMPA to join forces with NDA.

There is a fatal flaw in this theory. It assumes that when SMPA joined with NDA, the organization acquired a dominance in the Inland Empire market area which SMPA had not enjoyed when it was a separate cooperative. We are shown no evidence to sustain that assumption. Rather the evidence is that, by 1974, the number of dairy farmers in the Inland Empire area belonging to NDA, had dropped from 155 to 122. Therefore, whatever market control NDA had in the area in 1974, when the decision was made to raise the price of the producers' milk above the federal order minimum, it was no greater than it had been in 1972, when SMPA was a separate cooperative. Since both SMPA and NDA were agricultural cooperatives, each had the right to set the prices at which it would sell its produce. *Maryland & Va. Milk Producers Ass'n v. United States,* 362

U.S. 458, 4 L. Ed. 2d 880, 80 S. Ct. 847 (1960); *Fairdale Farms, Inc. v. Yankee Milk, Inc., supra; Northern Cal. Supermarkets, Inc. v. Central Cal. Lettuce Producers Coop.,* 413 F. Supp. 984 (N.D. Cal. 1976).

In *Fairdale Farms,* it was held that a cooperative association organized for the sole purpose of fixing prices is entitled to Capper–Volstead protection. The court rejected the suggestion that although the United States Supreme Court had said in *Maryland & Va. Milk Producers Ass'n v. United States, supra,* that farmer cooperatives may fix the prices at which they will sell their produce, the Capper–Volstead Act gives only single cooperatives, not associations of cooperatives, the right to fix prices. *See also Kinnett Dairies, Inc. v. Dairymen, Inc., supra.*

The fact that the cooperatives here may have enjoyed a monopoly does not, in itself, cast any cloud upon their right to set the prices at which they were willing to sell their milk.

Assuming that NDA had substantial monopoly power to set its milk prices, such power was not achieved as a result of the union with SMPA but was a result of the membership strength. Assuming, further, that certain acts of NDA prior to the dissolution of SMPA were designed to induce or coerce the members of SMPA to vote in favor of the reorganization, and assuming that these acts were serious enough to amount to predatory practices,[4] the joining together of the two cooperatives was not the cause of the

---

[4]As the district judge observed in a footnote in *Northern Cal. Supermarkets, Inc. v. Central Cal. Lettuce Producers Coop., supra,* cases where courts have found predatory practices have involved serious coercive conduct aimed at bringing nonmember producers into the cooperative or achieving monopoly through threats, boycotts and interference with others. *See, e.g., Maryland & Va. Milk Producers Ass'n v. United States, supra; Fairdale Farms, Inc. v. Yankee Milk, Inc., supra; Bergjans Farm Dairy Co. v. Sanitary Milk Producers,* 241 F. Supp. 476 (E.D. Mo. 1965), *aff'd,* 368 F.2d 679 (8th Cir. 1966); *In re Washington Crab Ass'n,* 66 F.T.C. 45 (1964); *North Tex. Producers Ass'n v. Metzger Dairies, Inc.,* 348 F.2d 189 (5th Cir. 1965), *cert. denied,* 382 U.S. 977, 15 L. Ed. 2d 468, 86 S. Ct. 545 (1966). *See also Treasure Vly. Potato Bargaining Ass'n v. Ore–Ida Foods, Inc.,* 497 F.2d 203, 216 n.11 (9th Cir.), *cert. denied,* 419 U.S. 999, 42 L. Ed. 2d 273, 95 S. Ct. 314 (1974).

rise in prices. The raising of the price was done pursuant to a marketing judgment made by the cooperatives' management. That judgment could just as easily have been made by the former management of SMPA and with the same results.

It is established that the legal injury for which damages are sought in a private antitrust action must be one which directly and proximately results from the violations of law. *Royster Drive–In Theatres, Inc. v. American Broadcasting–Paramount Theatres, Inc.*, 268 F.2d 246 (2d Cir.), *cert. denied,* 361 U.S. 885 (1959); *E.V. Prentice Mach. Co. v. Associated Plywood Mills, Inc.*, 252 F.2d 473 (9th Cir.), *cert. denied,* 356 U.S. 951 (1958); *Fiumara v. Texaco Inc.*, 204 F. Supp. 544 (E.D. Pa. 1962); *Goldsmith v. St. Louis–San Francisco Ry.*, 201 F. Supp. 867 (W.D.N.C. 1962); *Molinas v. National Basketball Ass'n,* 190 F. Supp. 241 (S.D.N.Y. 1961). E. Timberlake, *Federal Treble Damage Antitrust Actions* § 20.01 (1965).

The Ninth Circuit Court in the *Prentice Machine Co.* case stated the rule as follows: In a treble damage action, the plaintiff must establish with reasonable probability the existence of some causal connection between the defendant's wrongful act and some loss of anticipated revenue.

A plaintiff who brings a treble damage antitrust suit must allege a causative link to his injury which is direct rather than incidental, or which indicates that his business or property was in the "target area" of the defendant's illegal act. *Billy Baxter, Inc. v. Coca–Cola Co.*, 431 F.2d 183 (2d Cir. 1970). *Accord, GAF Corp. v. Circle Floor Co.*, 329 F. Supp. 823 (S.D.N.Y. 1971); *SCM Corp. v. RCA,* 407 F.2d 166 (2d Cir.), *cert. denied,* 395 U.S. 943, 23 L. Ed. 2d 461, 89 S. Ct. 2014 (1969); *Productive Inventions, Inc. v. Trico Prods. Corp.*, 224 F.2d 678 (2d Cir. 1955), *cert. denied,* 350 U.S. 936, 100 L. Ed. 818, 76 S. Ct. 301 (1956); *Knuth v. Erie–Crawford Dairy Coop. Ass'n,* 326 F. Supp. 48, 54 (W.D. Pa. 1971), citing *Bookout v. Schine Chain Theatres, Inc.*, 253 F.2d 292, 295 (2d Cir. 1958) where Judge Learned Hand said:

"The action at bar will not lie because all claims under the Anti–Trust Acts rest upon wrongs done by the suppression of competition and must be initiated by a party whose commerce has been directly injured."

*Cf. Wilson v. Ringsby Truck Lines, Inc.*, 320 F. Supp. 699 (D. Colo. 1970); *Johnson v. Ready Mix Concrete Co.*, 318 F. Supp. 930 (D. Neb. 1970).

In accord with these rules, RCW 19.86.090 gives a cause of action for damages to anyone who is injured in his business or property by a violation of RCW 19.86.020 through .060. Under this provision, it is clear that a causal connection must be shown between the violation and the injury.

Whatever the inducements which persuaded the members of SMPA to join with NDA, that joinder did not increase the cooperatives' monopoly power in the area. As was the case in *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 8 L. Ed. 2d 305, 82 S. Ct. 1130 (1962), there is no showing that the structure of the organizations had economic significance. There being no showing of a causal connection, the trial court erred in permitting the case to go to the jury on this theory.

We turn to Bar–T's theory that the prices set by the cooperative resulted in "pool loading", a practice which, the record shows, is considered unacceptable by the Department of Agriculture.

"Pool loading" as understood in the Department of Agriculture, is accomplished by loading the "targeted" market with unneeded milk, resulting in a drop in the blend price which the farmer receives for his milk. While the motives for such activities are not always apparent, there was evidence that the practice is sometimes used in an effort to persuade nonmembers that their interests would be better served were they to join the cooperative.

Raising prices is not "pool loading", whatever effect it may have on the market. We are shown no authority that price setting, in itself, is a predatory practice. On the contrary, it is the very right which the Capper–Volstead Act, as well as section 6 of the Clayton Act, was designed to pro-

tect.[5] True, if prices are set too high, outsiders will be encouraged to bring milk into the market and sell at lower prices, thus depriving the local farmers of some of their customers, and eventually bringing about a drop in the blend price. That is what happened here. But if there was "pool loading", it was done by the outsider, NFO, not by Consolidated. It was therefore error to submit to the jury Bar–T's theory that by raising its prices Consolidated engaged in a predatory practice.

Finding before us no evidence to support the verdict, the judgment on the cross complaint is reversed and the action is dismissed.

BRACHTENBACH, C.J., and STAFFORD, UTTER, DOLLIVER, WILLIAMS, and DORE, JJ., concur.

DIMMICK, J. (concurring)—I am constrained by the present state of the law to concur in the majority's holding. Unfortunately, respondent has no cause of action under these circumstances due to the operation and effect of the Capper–Volstead Act and federal agricultural marketing laws.

---

[5]The question whether prices were "unduly enhanced" was not at issue in this lawsuit, although Bar–T elicited from two farmers an account of their income over a period of years, for the purpose of showing that farmers were not experiencing a sufficient degree of hardship to warrant the raising of prices. There is nothing in the evidence to indicate that the income of these farmers reflected a return on investment and labor higher than that generally received by persons (whether farmers or other entrepreneurs) in a comparable position.

The Capper–Volstead Act reposes in the Secretary of Agriculture the authority to issue a cease and desist order if it finds that monopolization has occurred to the extent that prices are unduly enhanced. 7 U.S.C. § 292. *See* P. Areeda & D. Turner, *Antitrust Law* § 228 (1978); *Northern Cal. Supermarkets, Inc. v. Central Cal. Lettuce Producers Coop.*, 413 F. Supp. 984, 993 n.9 (N.D. Cal. 1976). It appears that the Secretary has never issued such an order. No court, insofar as we can ascertain, has ever proposed to usurp the Secretary's authority in this area.

Washington's "little Capper–Volstead Act" places upon the Attorney General, rather than the director of the Department of Agriculture, the responsibility for determining when prices have been unduly enhanced as a result of monopolization or restraint of trade (RCW 24.34.020), in which event he is authorized to issue, after a hearing, a cease and desist order. It appears that he, like the United States Secretary of Agriculture, has never found it appropriate to issue such an order.

182

Those laws, including federal marketing orders, have a strong historical basis. However, in today's market they are criticized in all quarters and should be reevaluated. For example, the Capper–Volstead Act provides that the Secretary of Agriculture may take action against an association if the "price of any agricultural produce is unduly enhanced" by reason of a monopoly or restraint of trade. Washington's "little Capper–Volstead Act" places this responsibility on the Attorney General. As noted by the majority, neither official has ever taken any such action. These decisions not to act are based upon a variety of reasons, *i.e.,* inadequate resources, lack of knowledge, etc.

Practices never intended by the present laws are occurring and apparently being tacitly sanctioned. In addition, the public is becoming more aware of such practices through media criticism. Accordingly, it may be time for Congress to reappraise the federal agricultural marketing laws and their effect, allowing our state Legislature to do the same.

Reconsideration denied April 5, 1982.